OPINION OF THE COURT
Richard M. Platkin, J.
This is a combined CPLR article 78 proceeding and action by which petitioners-plaintiffs (petitioners) seek a judgment: (1) declaring that the State Comptroller lacks authority to audit charter schools, and that the legislative direction to conduct such audits, set forth in General Municipal Law § 33 (2) and Education Law § 2854 (1) (c), was enacted in violation of article V § 1 of the New York State Constitution; and (2) permanently enjoining the Comptroller from conducting or attempting to conduct audits of charter schools.
*237 Charter Schools
Pursuant to the New York Charter Schools Act of 1998 (L 1998, ch 4), the State Legislature “ authorize[d] a system of charter schools to provide opportunities for teachers, parents, and community members to establish and maintain schools that operate independently of existing schools and school districts” (Education Law § 2850 [2]). In order to evaluate the claims and defenses asserted in this proceeding, it is necessary to review the act in some detail.
The process of establishing a charter school begins with an application submitted “by teachers, parents, school administrators [or] community residents” (Education Law § 2851 [1]). The organizers of the charter school submit an application to a “charter entity,” which the act defines as: (1) the Board of Regents; (2) the Board of Trustees of the State University of New York; or (3) the board of education of a school district or, in the case of the City of New York, the Chancellor of the Department of Education (§ 2851 [3]).
“Upon approval of an application by a charter entity, the applicant and charter entity shall enter into a proposed agreement allowing the applicants to organize and operate a charter school” (Education Law § 2852 [5]). This written agreement between the organizers of a charter school and the charter entity— known as the “charter” — controls all aspects of the governance, organization and operation of the school. The charter also includes “the specific commitments of the charter entity relating to its obligations to oversee and supervise the charter school” (id.).
A proposed charter must be approved by the Board of Regents before it becomes effective (§ 2852 [5-a]). Upon such approval, “the board of regents shall incorporate the charter school as an education corporation for a term not to exceed five years” (Education Law § 2853 [l]).[1] The Education Law defines an “education corporation” as a corporation “chartered or *238 incorporated by the regents or otherwise formed under [the Education Law]” (Education Law § 216-a [1] [a]).[2] An education corporation is governed by the Not-For-Profit Corporation Law, subject to certain limited modifications and exceptions that reflect the unique role of the Board of Regents in supervising and overseeing public and private education in New York State (Education Law § 216-a [4]). The trustees of a charter school are required to obtain federal tax-exempt status for the education corporation within one year of issuance of the charter (Education Law § 2853 [1]).
Pursuant to the act, “[a] charter school shall be deemed an independent and autonomous public school, except as otherwise provided” (Education Law § 2853 [1] [c]). “The powers granted to a charter school under [the act] constitute the performance of essential public purposes and governmental purposes of this state” (§ 2853 [1] [d]), and a charter school is exempt from taxation to the same extent as other public schools (id.).
However, a charter school cannot levy taxes or acquire property by eminent domain (§ 2853 [1] [e]). The act also provides that a charter school shall be deemed a nonpublic (i.e., private) school for a variety of purposes, including student transportation and the provision of student instructional materials (§ 2853 [4]). Further, “[f|or purposes of local zoning, land use regulation and building code compliance, a charter school shall be deemed a nonpublic school” (§ 2853 [3] [a]).
Governance of the charter school is vested in its board of trustees, which has “final authority for policy and operational decisions of the school” (§ 2853 [1] [f|). The composition of the initial board of trustees of a school is determined by the organizers, and the charter is required to set forth “the qualifications, terms and method of appointment or election of trustees [and] the organizational structure of the school” (Education Law § 2851 [2] [c]).
Charter schools enjoy a broad exemption from the state and local laws, rules and regulations that govern public and private schools, but “shall meet the same health and safety, civil rights, and student assessment requirements applicable to other public schools” (Education Law § 2854 [1] [b]). In addition, the act *239 makes charter schools subject to certain other laws applicable to governmental entities, including the Open Meetings Law and Freedom of Information Law (§ 2854 [1] [e]; see Public Officers Law arts 6, 7).
“The charter entity and the board of regents shall be deemed to be the public agents authorized to supervise and oversee the charter school” (Education Law § 2853 [1] [c]). Thus, the “board of regents and charter entity shall oversee each school approved by such entity, and may visit, examine into and inspect any charter school, including the records of such school” (§ 2853 [2]). “Oversight by a charter entity and the board of regents shall be sufficient to ensure that the charter school is in compliance with all applicable laws, regulations and charter provisions” (id.). Further, a local school district also has the right to “visit, examine into, and inspect” charter schools located within the district (§ 2853 [2-a]).
The act provides that a “charter school shall be subject to the financial audits, the audit procedures, and the audit requirements set forth in the charter,” which “shall be consistent with generally accepted accounting and audit standards” (Education Law § 2854 [1] [c]). Further, the act requires “ [independent fiscal audits” at least once annually (id.). The 2005 amendments to these provisions, discussed infra, added a requirement of audits by the Comptroller.
For purposes of labor-management relations, the act provides that charter school personnel shall be the employees of “the education corporation formed to operate the charter school” (Education Law § 2854 [3] [a]). The act further provides:
“An employee of a charter school shall be deemed to be a public employee solely for purposes of article fourteen of the civil service law, except for section two hundred twelve of such law, and for no other purposes unless otherwise specified in this article, the board of trustees of the charter school shall constitute a board of education solely for purposes of article fourteen of the civil service law, except for section two hundred twelve of such law, and for no other purposes unless otherwise specified in this article, a charter school shall be deemed to be a public employer solely for purposes of article fourteen of the civil service law, except for section two hundred twelve of such law, and for no other purposes unless otherwise specified in this article, and the chief executive officer of the charter school *240 shall be the person designated as such by the board of trustees of the charter school.” (Id.)
Teachers of a charter school generally “shall be certified in accordance with the requirements applicable to other public schools,” but a specified percentage may be credentialed in an alternative manner (Education Law § 2854 [3] [a-1]). A charter school has the option of treating its staff as either public or private sector employees for the purpose of providing pension and other retirement benefits (§ 2854 [3] [c]; 8 NYCRR 119.2).
Any child eligible for admission to a public school is qualified for admission to a charter school (Education Law § 2854 [2] [b]). “The school shall enroll each eligible student who submits a timely application . . . , unless the number of applications exceeds the capacity” of the school; “[i]n such cases, students shall be accepted from among applicants by a random selection process,” subject to certain statutory preferences (id.). A charter school may not charge tuition or fees, but may require the payment of fees on the same basis and to the same extent as other public schools (§ 2854 [2] [a]).
Charter schools receive both public and private funding. With respect to public funding, the act provides that the school district of residence shall pay “basic tuition” directly to the charter school for each child in attendance (Education Law § 2856 [1] [a]; § 3602 [1] [f]). The amount of this tuition payment is determined by reference to the school district’s per-pupil approved operating expenses, which are supported by the local property tax levy, as well as by federal and state education funds appropriated to the school district (id.). Charter schools also may accept funding from private sources (Education Law § 2856 [3]). In fact, the Legislature specifically has encouraged “[pjrivate persons and organizations ... to provide funding and other assistance to the establishment or operation of charter schools” (Education Law § 2853 [4] [d]).
A charter may be revoked at any time by the Board of Regents or the charter entity for inadequate educational outcomes or material violations of the charter, including fiscal mismanagement (Education Law § 2855 [1]). Upon the expiration of the term of the charter, the operators of the school may submit an application for renewal (Education Law § 2851 [4]).
The 2005 Legislation
Prior to 2005, General Municipal Law § 33 required the State Comptroller to “cause the accounts of all officers of each such municipal corporation, industrial development agency, district, *241 agency and activity to be inspected and examined by one or more examiners of municipal affairs for such periods as the comptroller shall deem necessary.”
By section 3 of chapter 267 of the Laws of 2005, the Legislature added the following requirements:
“a. . . . [T]he comptroller shall cause the accounts of every school district, BOCES and charter school in the state to be examined pursuant to a plan developed by the comptroller. Such audits shall be conducted in a manner so as to provide, that every school district, BOCES and charter school shall be audited at least once by March thirty-first, two thousand ten. The priority and frequency of such audits, and any audits conducted thereafter, shall be based upon a risk assessment process conducted by the comptroller which may include investigations of alleged improprieties, previous audit findings and recommendations, or other financial performance indicators. . . .
“b. In undertaking such audits the comptroller’s review shall include, but not be limited to:
“(1) examining, auditing and evaluating financial documents and records of school districts, BOCES and charter schools,
“(2) assessing the current financial practices of school districts, BOCES and charter schools to ensure that they are consistent with established standards, and “(3) determining that school districts, BOCES, and charter schools provide for adequate protections against any fraud, theft, or professional misconduct.” (General Municipal Law § 33 [2] [a], [b].)
Conforming amendments were made to Education Law § 2854 (1) (c), so as to provide that charter schools “shall be subject to the audits of the comptroller as set forth” in the amended General Municipal Law § 33.
By letter dated July 1, 2007, the Office of the State Comptroller advised charter schools located in the City of New York of its intention to audit their performance. The letter cited the statutory authority conferred by chapter 267, as well as the Comptroller’s claim of constitutional authority, founded on article V, § 1 of the New York Constitution. Some of the charter schools that received this correspondence disputed the Comptroller’s authority to undertake such audits.
*242 By letter dated September 27, 2007, the Comptroller’s counsel responded to the objections posited by some of the charter schools. In this response the Comptroller’s counsel not only delineated the constitutional and statutory claims of authority for the audits but also specified some of the scope of the intended review, which focused on the educational outcomes of students attending charter schools:
“This audit will assess the extent to which the New York City charter schools at issue have met the specific, quantifiable goals explicitly set forth in their charters. As I understand it, these goals establish grade-specific target student success rates in meeting or exceeding certain scoring levels on identified standardized or non-standardized tests or Regents’ Examination requirements. In addition to ascertaining whether the above measurable target goals have been attained, the audit will examine into whether the charter schools have complied with their own selection procedures and criteria in admitting students. These are matters that have clear fiscal implications for the public as well as the governmental entities that fund the charter schools and have programmatic and oversight responsibilities with respect to them.”
This litigation followed.
This Proceeding
Petitioners Opportunity Charter School, New Heights Academy Charter School, Renaissance Charter School, International Leadership Charter School, Hellenic Classical Charter School, Harlem Children’s Zone/Promise Academy Charter School, Harlem Children’s Zone/Promise Academy II Charter School, John V. Lindsay Wildcat Academy Charter School, Hyde Leadership Charter School, New York Center for Autism Charter School, Brooklyn Charter School, Manhattan Charter School, South Bronx Charter School for International Cultures and the Arts, Community Roots Charter School and Ross Global Academy Charter School (charter school petitioners) are charter schools located in the City of New York that received an audit demand letter from the Office of the State Comptroller.
The remaining two petitioners are not-for-profit associations that advocate on behalf of charter schools. New York Charter Schools Association, Inc. is a statewide organization that engages in public outreach, education and advocacy on behalf of its member charter schools and provides technical assistance *243 and support to charter schools. The charter school petitioners are members of this association. New York City Center for Charter School Excellence, Inc. is a partnership between the City of New York and its philanthropic community with the mission of stimulating the supply of high quality charter schools and advocating on behalf of New York City’s charter schools.
By amended verified petition and complaint, petitioners commenced this hybrid action-proceeding against respondents-defendants Thomas E DiNapoli, as Comptroller of the State of New York, the Office of the State Comptroller and the State of New York (hereinafter respondents). The sole claim asserted by petitioners is that the Comptroller lacks the constitutional authority to conduct audits of charter schools.
Specifically, petitioners argue that charter schools are independent, not-for-profit education corporations and are not agencies of the State of New York or political subdivisions of the State. On that basis, petitioners contend that article V, § 1 of the New York Constitution prohibits the Legislature from assigning the Comptroller the power or duty of auditing charter schools. Further, petitioners contend that the task of auditing charter schools is an administrative duty that is not incidental to the Comptroller’s constitutionally prescribed functions and, therefore, is prohibited by article V, § 1.
Accordingly, petitioners seek a judgment declaring that the Comptroller has no authority to audit charter schools and that the grant of such authority contained in General Municipal Law § 33 and Education Law § 2854 (1) (c) is unconstitutional. Eetitioners also seek a permanent injunction prohibiting the Comptroller from conducting or attempting to conduct audits of charter schools.
Respondents oppose the petition through an answer and also move for summary judgment dismissing petitioners’ complaint pursuant to CELR 3212. As a threshold matter, respondents contend that petitioners lack both capacity and standing to maintain this action. With respect to the merits, respondents argue that charter schools are political subdivisions of the State within the meaning of article V, § 1 and, in the alternative, the task of auditing charter schools is incidental to the Comptroller’s duly assigned function of auditing school districts and his fundamental responsibility to superintend the fiscal affairs of the State.
Capacity
Respondents contend that, as political subdivisions of the State, the petitioner charter schools lack the legal capacity to *244 challenge the constitutionality of the statutes directing the Comptroller to audit charter schools.
“Capacity to sue is a threshold matter allied with, but conceptually distinct from, the question of standing. As a general matter, capacity ‘concerns a litigant’s power to appear and bring its grievance before the court’ (Community Bd. 7 v Schaffer, 84 NY2d 148, 155). Capacity may depend on a litigant’s status or ... on authority to sue or be sued. In Community Bd. 7, we noted that capacity may be expressly conferred or ‘inferred as a “necessary implication from [the agency’s] power[s] and responsibilities],” provided, of course, that “there is no clear legislative intent negating review” ’ (id. at 156 [quoting Matter of City of New York v City Civ. Serv. Commn., 60 NY2d 436, 443-444, rearg denied 61 NY2d 759]).” (Silver v Pataki, 96 NY2d 532, 537 [2001].)
It is well established that “municipalities and other local governmental corporate entities . . . lack capacity to mount constitutional challenges to acts of the State and State legislation” (City of New York v State of New York, 86 NY2d 286, 289 [1995]). In arguing that charter schools fall within this rule, respondents assert that charter schools are public schools that exercise governmental functions in the area of public education. Respondents also point to the fact that charter schools are incorporated by the Board of Regents pursuant to a detailed statutory scheme from which charter schools draw their powers and duties. On this basis, respondents argue that charter schools have no more capacity to maintain a constitutional action against the State than do municipalities (see City of New York, supra) or school districts (see New York State Assn. of Small City School Dists., Inc. v State of New York, 42 AD3d 648, 649 [3d Dept 2007]).
The flaw in this argument, however, is that charter schools are not political or governmental subdivisions of the State, a conclusion discussed in detail infra. Rather, charter schools are established as separate legal entities, governed in virtually all respects by the Not-For-Profit Corporation Law, that carry out their mission of providing educational services to the public in an independent and autonomous manner. “The lack of capacity of municipalities to sue the State is a necessary outgrowth of separation of powers doctrine: it expresses the extreme reluctance of courts to intrude in the political relationships between the Legislature, the State and its governmental subdivi *245 sions” (City of New York, 86 NY2d at 295-296). Since the corporate entities that operate charter schools are not subdivisions of the State, this rule is not implicated.
In any event, the general rule that municipalities lack capacity to maintain constitutional challenges against the State admits of several exceptions, one being an express statutory authorization to sue {id. at 291). Through application of the Not-For-Profit Corporation Law {see Education Law § 2853 [1]; § 216-a [4]), the Legislature expressly has conferred upon charter schools the power “[i]o sue and be sued in all courts and to participate in actions and proceedings ... in like cases as natural persons” (N-PCL 202 [a] [2] [emphasis added]). While a general authorization to sue has been held insufficient to authorize a political subdivision to prosecute a constitutional action against the State (see City of New York at 293), the power of a charter school to sue “as a natural person” is a far more expansive grant of authority that encompasses the prosecution of constitutional claims. Indeed, had the Legislature intended to limit the capacity of charter schools to sue “in like cases as political subdivisions,” it could easily have said so.
Standing
Respondents also argue that petitioners lack standing to maintain this action, contending that charter schools cannot allege an injury-in-fact that falls within the zone of interest of General Municipal Law § 33 (2) and Education Law § 2854 (1) (c). In proposing to examine the zone of interest of the challenged enactments, however, respondents misdirect their inquiry.
Petitioners are challenging the aforementioned statutes as having been enacted in violation of New York Constitution, article V, § 1, an express constitutional restriction on the Legislature’s otherwise plenary lawmaking authority. Accordingly, the issue is not whether petitioners fall within the zone of interest of the statutes they claim to be unconstitutional; rather, the proper inquiry is whether petitioners are within the zone of interest of the constitutional provision that forms the basis of their claim for relief.[3]
Respondents cite Society of Plastics Indus, v County of Suffolk (77 NY2d 761, 773 [1991]) for the proposition that “a party *246 must show that the in-fact injury of which it complains . . . falls within the ‘zone of interests,’ or concerns, sought to be promoted or protected by the statutory provision under which the agency has acted” (emphasis added). While the quoted language is a correct statement of the law, the analysis in that case demonstrates the flaw in respondents’ proposed application of the zone of interest test here.
In Society of Plastics, plaintiff challenged a local law banning the use of certain plastic products as having been enacted in violation of the State Environmental Quality Review Act (SE-QRA). The issue addressed by the Court of Appeals was not whether the injuries alleged by plaintiff, a trade association in the plastics industry, fell within the zone of interest of the local law banning the products manufactured and sold by its members. Rather, the critical issue before the Court was whether the injuries alleged by plaintiff fell within the zone of interest to be promoted or protected by SEQRA, the statute it relied upon in challenging the local law.
Respondents do not dispute that the charter school petitioners will suffer an injury-in-fact if they are subjected to unconstitutional audits by the State Comptroller.[4] Nor do respondents contend that charter schools fall outside the zone of interest protected by New York Constitution, article § 1, which was intended to confine the Comptroller to certain prescribed functions and administrative duties incidental to such functions (see infra). Further, while not controlling, it bears noting that the Court of Appeals has permitted similar challenges to the Comptroller’s audit authority under article V, § 1 (see e.g. Matter of Dinallo v DiNapoli, 9 NY3d 94 [2007]; Blue Cross & Blue Shield of Cent. N.Y. v McCall, 89 NY2d 160, 168 [1996]).
Having concluded that the charter school petitioners have standing to maintain this action, it is unnecessary to address respondents’ challenge as to the petitioner associations (see *247 County of Rensselaer v Regan, 80 NY2d 988, 991 n [1992]). In any event, respondents’ challenge to the standing of the associations is premised on their contention that the individual charter school members lack standing, which the court rejects.[5]
Constitutional Claim
“Legislative enactments are entitled to a strong presumption of constitutionality” (Dalton v Pataki, 5 NY3d 243, 255 [2005] [internal quotation marks omitted]). “While the presumption is not irrefutable, parties challenging a duly enacted statute face the initial burden of demonstrating the statute’s invalidity ‘beyond a reasonable doubt’ ” (LaValle v Hayden, 98 NY2d 155, 161 [2002], quoting People v Tichenor, 89 NY2d 769, 773 [1997]).
The Comptroller is the chief fiscal officer of the State, charged with the “unique, fundamental duty to superintend the fiscal concerns of the State” (Barrios-Paoli, 93 NY2d at 104). New York Constitution, article V, § 1, which is the “wellspring of the Comptroller’s authority” (id. at 105), provides as follows:
“The comptroller shall be required: (1) to audit all vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties. ... In such respect the legislature shall define the powers and duties and may also assign to him or her: (1) supervision of the accounts of any political subdivision of the state; and (2) powers and duties pertaining to or connected with the assessment and taxation of real estate .... The legislature shall assign to him or her no administrative duties, excepting such as may be incidental to the performance of *248 these functions, any other provision of this constitution to the contrary notwithstanding.”
Thus, article V, § 1 first establishes certain mandatory functions of the Comptroller — all pertaining to the State’s finances— and directs the Legislature to define his powers and duties with respect thereto. Second, it permits the Legislature to assign the Comptroller certain additional functions, including the “supervision of the accounts of any political subdivision of the state.” Finally, article V, § 1 prohibits the Legislature from assigning the Comptroller any administrative duties, except those incidental to the performance of his duly assigned functions.
In arguing that the Legislature cannot assign the Comptroller the task of auditing charter schools, petitioners’ principal contention is that charter schools are independent, not-for-profit education corporations and are not political subdivisions of the State. Petitioners further contend that the task of auditing charter schools is an administrative duty that is not incidental to the performance of the Comptroller’s constitutionally prescribed functions. The court will consider each of these arguments in turn.
A. “Political Subdivision of the State”
In determining whether a charter school is a “political subdivision of the state” within the meaning of article V, § 1, the court begins, as it must, with the plain language of the State Constitution. While the term “political subdivision” appears on its face to connote a division of the State into smaller units (i.e., subdivisions) that exercise at least some portion of the State’s governmental (i.e., political) power,[6] a definition of the term is not found within the State Constitution. Indeed, the term “political subdivision” did not appear in the State Constitution until the adoption of article V, § 1 in 1925.[7] Since that time, “political subdivision” has been used in two other sections of the State Constitution, again without definition.[8]
*249 1, Preadoption Understanding of “Political Subdivision”
While the framers of New York Constitution, article V, § 1 could not draw upon an established constitutional construction of the term “political subdivision,” the concept of political or governmental subdivisions of the State — whether denominated “political subdivisions,” “civil divisions” or “governmental subdivisions” — was a familiar one. In Markey v County of Queens (154 NY 675, 680 [1898]), the Court of Appeals explained:
“To a clear understanding of the question, it may be well to consider what was the legal status of counties of this state and then, incidentally, what is that of a municipal corporation proper, such as an incorporated city. The civil divisions of a state into counties had their origin in England; where, preceding the organization of the kingdom itself, they were, thereafter, continued from recognized necessities in government; as other countries had their departments, or their provinces. In such divisions, it was found that the purposes of local government and of the administration of justice were promoted. Differing from England in their origin, in this country they were first created by the Legislatures of the various colonies and, subsequently, by the states of the Union. They were invested with such corporate attributes as were essential to a proper performance of the duties of local government. They were, in effect, subdivisions of the governed territory, established for the more convenient administration of government and having such powers as were necessary to be exercised for the welfare, advantage and protection of the public within their boundaries. While in the People resided the sovereign right to declare the general mode of their government, it *250 was the appropriate duty of their legislative body to so arrange the territory of the state into civil divisions and to so apportion among them governmental duties, as would best conduce to the advantage of its citizens.” (Emphasis added.)
Similarly, in People ex rel. Williams Eng’g & Contr. Co. v Metz (193 NY 148, 161 [1908]), the Court of Appeals characterized counties, cities, towns and villages as “political divisions” established by the State. To the same effect is People ex rel. Town of Pelham v Village of Pelham (215 NY 374, 385-386 [1915]), in which the Court of Appeals recognized that cities, towns and villages are political subdivisions of the State, with villages being described as “the smallest political subdivision established by the Constitution” (see also People ex rel. Bolton v Albertson, 55 NY 50, 56 [1873] [cities, towns and villages are “civil and political divisions of the State”]; People, ex rel. Hon Yost v Becker, 203 NY 201, 208 [1911] [“civil divisions for political purposes”]).
In addition to the traditional forms of municipal government, school districts also had been recognized as “civil division[s] of the state” prior to the adoption of article V, § 1 (Herman v Board of Educ. of Union School Dist. No. 8, Town of Arcadia, Wayne County, 234 NY 196, 202 [1922]). This status later was confirmed in Village of Kenmore v County of Erie (252 NY 437, 442 [1930]), in which the Court of Appeals explained that “[s]chool districts are, like counties, governmental subdivisions of the State, though their governmental function is confined to education.” The Court noted therein that “[a] county is a municipal corporation, comprising the inhabitants within its boundaries, and formed for the purpose of exercising the powers and discharging the duties of local government, and the administration of public affairs conferred upon it by law” {id. at 441; see also Palmer v Board of Educ., 276 NY 222, 228 [1937] [“a rural school district is a local civil division of the State in which the State through local agencies provides for the education of its inhabitants”]).
Prior to the adoption of New York Constitution, article V, § 1, the Court of Appeals also had recognized special improvement districts, such as police, fire, sewer, water and utility districts, as civil and political subdivisions of the State (see Bolton at 66-67; accord Gaynor v Marohn, 268 NY 417 [1935]). In this line of authority, the Court of Appeals declared that a defined and contiguous geographic territory was essential to the status of an entity as a political or civil subdivision of the State:
*251 “There may be no positive express prohibition against constituting counties, cities, villages and towns of dissevered and disconnected territories, but it would be opposed to the evident spirit of the Constitution and to the policy of the State; and the same is true of any civil division of the State for political purposes, which the legislature may create. The very idea of a distinct civil and political division of a State, necessarily implies a part of the State set apart and separated from every other part for a special purpose, compact and united, and not separated and divided by intervening territory, and other divisions, under separate and distinct local organizations.” (Bolton at 66.)
Thus, at the time of the formulation and adoption of article V, § 1, the term “political subdivision,” as well as the closely allied terms “civil division” and “governmental subdivision,” were understood to connote a contiguous territorial subdivision of the State established to exercise governmental authority. That sovereign authority could support the exercise of the full range of governmental functions, such as with a county or city, or could be confined to specified functions, as with school districts and special improvement districts. Further, at the time of the adoption of article V, § 1, the common law recognized municipalities, such as counties, cities, towns and villages, school districts and special improvement districts as political subdivisions of the State.
2. Constitutional History of Article Y, § 1
The genesis of New York Constitution, article V, § 1 is found in the 1915 Constitutional Convention (1915 Convention). Delegates to the convention were presented with a study that observed two significant defects in the State Constitution pertaining to the office of Comptroller: (1) the failure to prescribe the fundamental duties of such office; and (2) the failure to protect the independent character of the office from intrusion by the State Legislature (see The Constitution and Government of the State of New York: An Appraisal, at 84-86 [1915] [hereinafter 1915 Report]). The 1915 Convention proposed an amendment intended to address these concerns, but its proposal did not use the term “political subdivision” or otherwise prescribe the scope of the Comptroller’s authority over matters of local finance. The voters ultimately rejected the work of the 1915 Convention.
Nonetheless, efforts to reform the structure of government continued under the leadership of Governor Alfred E. Smith. In *252 1919, a bipartisan blue-ribbon commission offered a proposal for the sweeping reorganization of state government (see Report of Reconstruction Commission to Governor Alfred E. Smith on Retrenchment and Reorganization in the State Government [Oct. 10, 1919] [hereinafter 1919 Report]). The overall goal was to “impress upon the people of the State the need of retrenchment and reorganization” in order to promote accountability and efficiency and reduce the spiraling costs of government (id. at 3-5; see Blue Cross & Blue Shield of Cent. N.Y. v McCall, 89 NY2d 160, 168 [1996]).
Consistent with these objectives and the earlier work of the 1915 Convention, the 1919 Report recommended that the fundamental duties of the Comptroller should be set forth in the Constitution and the independent character of the office should be protected from legislative intrusion (see 1919 Report at 14-15, 53). In reviewing the Comptroller’s audit functions at the time, the 1919 Report recognized that the Bureau of Municipal Accounts “examines the accounts of civil divisions of the State” other than certain cities (id. at 55; see also McCall v Barrios-Paoli, 93 NY2d at 107). The 1919 Report did not contemplate any significant change in such responsibilities (1919 Report at 56-57), stating that, under its proposal, the “Municipal Accounts Bureau will examine the accounts of all municipalities of the State” (id. at 58). However, the draft constitutional amendment included in the 1919 Report does not use the term “political subdivision” or otherwise shed light on the meaning of such term.
Concurrent resolutions proposing amendments to New York Constitution, article V, § 1 were passed by two successive Legislatures and approved by the voters in 1925. In the session of the State Legislature immediately following the adoption of article Y, § 1, a legislative commission was formed to recommend implementing legislation for the constitutional changes:
“Recognizing that the constitutional amendment did not necessitate changes in the Comptroller’s duties with regard to oversight of municipal ‘accounts,’ the Commission advised that ‘[p]ursuant to the provisions of the constitutional amendment . . . the duties which at present devolve upon the Comptroller, of supervising the accounts of the various political subdivisions of the State shall be continued’ (Report of State Reorganization Commn, 1926 NY Legis Doc No. 72, at 24). As such the *253 Comptroller’s duties, which included performance examinations, remained unchanged.” (Barrios-Paoli at 107.)
Thus, while the constitutional history of article V, § 1 does not speak directly to the interpretation of the term “political subdivision,” it does demonstrate that the substance of the amendment was derived from the work of the 1915 Convention.[9] The court attaches some significance to this fact because the record of the 1915 Convention reveals that delegates were aware of the common-law understanding of the terms “political subdivision” and “civil division” and did not seek to modify their established interpretations (see 1 Rev Rec, 1915 NY Constitutional Convention, at 755-765). Further, the 1919 Report demonstrates that the Comptroller’s audit function with respect to municipal finance was understood to extend to “civil divisions” or “municipalities.” Finally, the history of article Y, § 1 demonstrates that the amendment was not understood to alter the Comptroller’s established function with respect to municipal audits.
3. Postadoption Judicial Decisions
The Court of Appeals has been called upon on several occasions to construe the term “political subdivision” used in New York Constitution, article Y, § 1. At one end of the spectrum, it is well established that traditional forms of municipal government, such as counties, cities, towns and villages, are “political subdivision^] of the state” within the meaning of article Y, § 1 (see Barrios-Paoli at 102). At the other end, it is equally clear that private, not-for-profit corporations are not political subdivisions, even where they are extensively regulated by the State and play an important role in an area of substantial state concern (Blue Cross & Blue Shield of Cent. N.Y. v McCall, 89 NY2d at 163 [not-for-profit health insurer]).
Between these extremes lies public benefit corporations, sometimes referred to as public authorities. In Patterson v Carey (41 NY2d 714 [1977]), the Court of Appeals explained that a public benefit corporation is not a “political subdivision” of the State within the meaning of article Y, § 1:
“The Constitution provides that the accounts of any public corporation are subject to the supervision of *254 the State Comptroller. (NY Const., art X, § 5.) The State Comptroller’s responsibility with respect to public corporations must be contrasted with the Comptroller’s constitutional jurisdiction over the State and its political subdivisions. The State Comptroller was made an independent auditing official for the affairs of the State. The Legislature was given the power to ‘define his powers and duties’ and to further assign him the supervision of accounts of any political subdivision. However, the Legislature was precluded from assigning the Comptroller any administrative duties, save those incidental to the performance of the Comptroller’s constitutional functions. (NY Const, art Y, § 1.) Article X of the Constitution pointedly employs the same language — ‘supervision of accounts’ — found in article V (III Revised Record of the 1938 New York State Constitutional Convention, p 2262). Yet the Constitution does not grant to the Legislature the power to define the Comptroller’s powers and duties with respect to public corporations. This crucial difference is explained by the intent of the amendment’s draftsman to build constitutional safeguards that the Legislature could not alter. Hence, the Legislature was not given the power to control the Comptroller’s exercise of discretion since, in doing so, the Legislature might, it was feared, interfere unduly with the independence of the Comptroller’s supervision. Nor is it possible to read the article V and the article X provisions together (see 1959 Opns of Atty Gen 55, 56). While the Legislature may regulate the Comptroller’s duties in regard to political subdivisions, public benefit corporations are not political subdivisions of the State. We have stated many times that, in the words of Judge Fuld, ‘a public authority enjoys an existence separate and apart from the State, even though it exercises a governmental function’.” (Id. at 723-724 [citations omitted and emphasis added]; accord Matter of Worth Constr. Co., Inc. v Hevesi, 8 NY3d 548, 552 [2007].)
In reaching this conclusion, the Court of Appeals relied upon its decision in Matter of Plumbing, Heating, Piping & A.C. Contrs. Assn, v New York State Thruway Auth. (5 NY2d 420 [1959]). In that case, the Court emphasized that a key attribute of a public authority is its corporate existence separate and distinct from the State:
*255 “The Thruway Authority was created by a special act of the Legislature (L. 1950, ch. 143) as a ‘public corporation’ to construct and maintain a thruway system (Public Authorities Law, §§ 352, 353). Although created by the State and subject to dissolution by the State, these public corporations are independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission. . . . The corporate entity is interposed, it has been said (1951 Atty.-Gen. 130, 132), both to ‘protect the State from liability and enable public projects to be carried on free from restrictions otherwise applicable.’ . . .
“As would, of course, be expected, the cases confirm the conclusion that a public authority enjoys an existence separate and apart from the State, even though it exercises a governmental function . . . and nothing decided or said in Easley v. New York State Thruway Auth. (1 N Y 2d 374) detracts from the force of what we have written. The court did, in the course of its opinion in Easley, note that ‘this Authority is an arm or agency of the State’ (1 N Y 2d, at p. 376), but, as the Appellate Division observed herein, ‘that is far different from saying it is the State.’ Certainly, there is a close relationship between the Thruway Authority and the State. . . . However close such relationship may be, though, it is abundantly clear that the Authority stands on its own feet, transacts its business affairs through its own personnel and on its own initiative and is not subject to the strict requirements imposed upon a board or department of the State” (id. at 423-425 [emphasis added]).
For similar reasons, the Court of Appeals held in Collins v Manhattan & Bronx Surface Tr. Operating Auth. (62 NY2d 361 [1984]) that a public authority is not a “civil division” of the State, as such term is used within the State Constitution:
“The provision [article Y, § 6] was first adopted as part of the Constitution of 1894. As originally proposed it would have covered only the State and cities. The words ‘all of the civil divisions thereof, including cities and villages’ were added, as the Convention debates establish, to expand the reach of the provision beyond urban regions to the ‘coun *256 try districts,’ including rural counties, towns and villages, as well. Clear from the debates is the fact that ‘civil divisions’ also included all ‘departments’ and ‘offices’ of the State, wherever located, without regard to their particular nature or size.
“The phrase comprehended, additionally, districts established to perform a particular governmental function in a given territory. At the time the 1894 Constitution was adopted these included police districts, sanitary districts and fire districts, and after its adoption, school districts and public welfare districts were also held to be civil divisions within the provision. Each, however, as had the earlier counterparts, exercised a particular governmental function — education, energy, welfare — within a limited and defined territory. . . .
“There were no public authorities in existence when the 1894 Constitution was adopted, the first in New York apparently being the 1921 creation of the Port of New York Authority. The question whether such an authority was covered by section 6 of article V appears not to have been raised prior to 1929, when the Attorney-General was asked whether employees of the Niagara Frontier Bridge Commission were in ‘the civil service of the state.’ Noting that the Commission ‘representad] a peculiar legislative development of recent years, a corporation having some of the characteristics of a private corporation and some of a state instrumentality’, the Attorney-General reasoned that a prime purpose for creating such corporations was to separate their administrative and fiscal functions from the State and its subdivisions and concluded that ‘this separation of function takes the commission and its employees beyond the present scope of the civil service’ (1929 Opns Atty Gen 223, 224). His conclusion was fortified by reference to the practice followed by two major authorities then functioning, the Port of New York Authority and the Albany Port District Commission. “That opinion is of particular significance in light of the inclusion of the merit and fitness provision in the 1938 Constitution without change, notwithstanding that the operation of public authorities was a topic of major concern at the 1938 Convention. Significant also in light of the failure to modify *257 the constitutional mandate is the Report of the Convention Committee which described public authorities as intended ‘to resemble in many respects a private business corporation . . . They operate on a business basis, and have complete control over the hiring and firing of employees and over their own organization and methods of operation.’
“The italicized language in that report must be understood as referring to authorities created by statute that did not expressly make the Civil Service Law applicable to the particular authority involved, for the Legislature had prior to 1938 directed that certain public authorities be governed by the provisions of that law. . . .
“There is no question that within the scope of its coverage, section 6 of article V, when adopted as part of the 1894 Constitution, was intended to extend civil service protections and reforms to a large number of government employees who had not been covered by prior civil service legislation. That intent alone does not, however, suffice to include in its embrace agencies not properly classifiable as civil divisions of the State. Not only the practice detailed above, but also the characteristics of public authorities, establish their dissimilarity from civil divisions. Although all civil divisions are territorial subdivisions of the State, a public authority is not, and although a public authority may provide governmental service often provided by the State or a civil division, it is intended to operate with greater autonomy than permitted by the legal and procedural barriers to which civil divisions are subject-. ‘Although created by the State and subject to dissolution by the State, these public corporations are independent and autonomous, deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission.’
“Not surprisingly, therefore, not only has the Temporary State Commission concluded that public authorities are not subject to section 6 of article V of the Constitution, but also the Attorney-General having carefully reconsidered the matter has found no reason to modify his earlier opinion (1951 Opns *258 Atty Gen 152) to the same effect. Moreover, courts passing upon the question have ruled likewise, and with but one exception have construed the term ‘civil division’ to cover only territorial subdivisions of the State created for the more convenient administration of government and empowered to exercise within their territorial boundaries powers which would otherwise be exercised by the State. We conclude, on the basis of the consistent history and precedent above outlined, that public authorities are not civil divisions within the meaning of the constitutional provision” {id. at 366-370 [citations omitted and emphasis added]).
4. Charter Schools Are Not “Political Subdivisions”
Charter schools were not among the types of entities recognized as “political subdivisions of the state” at the time of the adoption of New York Constitution, article V, § 1. Of course, that fact is not determinative, since charter schools are a relatively new vehicle for the delivery of educational services. Thus, it is necessary to compare the legal and functional characteristics of charter schools to the characteristics possessed by entities that the Court of Appeals has recognized, or declined to recognize, as political subdivisions of the State.
Applying this mode of analysis, the court concludes that charter schools cannot be considered “political subdivisions” within the meaning of the State Constitution. In reaching this conclusion, the court places significant (though not controlling) weight on the fact that a public benefit corporation is not a “political subdivision” for purposes of article V, § l.[10]
Charter schools share most, if not all, of the legal and functional characteristics of public benefit corporations that distinguish them from political subdivisions. Further, where charter schools and public benefit corporations differ, it is the characteristics of public benefit corporations that are far closer to those of recognized political subdivisions.
*259 A fundamental and defining characteristic of charter schools and public benefit corporations is that they enjoy “an existence separate and apart from the State, its agencies and political subdivisions” (Schulz v State of New York, 84 NY2d 231, 247 [1994]; see also Patterson at 724; Plumbing, Heating, Piping & A.C. Contrs. Assn, at 423).
Charter schools are incorporated as independent and autonomous education corporations, governed by their own board of trustees and subject to the Not-For-Profit Corporation Law in virtually all respects (see Education Law § 2853 [1]). In regard to the latter point, the court notes the opinion of the Commissioner of Education in Appeal of Stayton (Decision No. 13,788 [July 8, 1997]):
“Although this appeal is dismissed for mootness, I would be remiss if I did not point out that a city school district governed by Education Law Article 51 is not an ‘education corporation’ within the meaning of Education Law § 216-a. . . . City school districts are not not-for-profit corporations, but are statutory subdivisions of the State of New York. . . . City school districts are provided by statute with their own substantive and procedural provisions which differ markedly from the Not-for-Profit Corporation Law, and it is obvious that the Legislature has decided to provide for them in a substantially different way” (emphasis added).
Indeed, charter schools and public benefit corporations were established as legal entities separate and distinct from the State for virtually identical reasons. Public benefit corporations are
“deliberately designed to be able to function with a freedom and flexibility not permitted to an ordinary State board, department or commission. . . . The corporate entity is interposed, it has been said (1951 Atty.-Gen. 130, 132), both to ‘protect the State from liability and enable public projects to be carried on free from restrictions otherwise applicable.’ ” (Plumbing, Heating, Piping & A.C. Contrs. Assn., 5 NY2d at 423.)
While recognizing the close relationship between the State and public benefit corporations, “it is abundantly clear that [a public benefit corporation] stands on its own feet, transacts its business affairs through its own personnel and on its own initiative and is not subject to the strict requirements imposed upon a board or department of the State” (id. at 424-425).
*260 The same is true of charter schools, which were authorized to provide opportunities for teachers, parents, and community members to establish and maintain independent schools that promote innovation and creativity through increased flexibility and freedom (see Education Law § 2850 [2]). Consistent with these objectives, charter schools enjoy an unprecedented exemption from state and local laws, rules and regulations that govern public and private schools, subject only to several narrowly drawn exceptions (Education Law § 2854 [1] [b]). Further, as with public benefit corporations, charter schools operate in an independent and autonomous manner, governed by a board with full authority for policy and operational decisions (Education Law § 2853 [1] [c], [f]). Thus, as with a public benefit corporation, a charter school stands on its own feet, transacts its business affairs through its own personnel and on its own initiative, and is not subject to the strict requirements imposed upon a board or department of the State or a political subdivision.
In addition to providing freedom and flexibility, the corporate separateness of charter schools and public authorities also serves to protect the State and its political subdivisions from liability. Article X, § 5 of the New York Constitution provides that
“[n] either the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof. . . .”
Education Law § 2853 (1) (g) is to the same effect, providing that “no civil liability shall attach to any charter entity, the board of regents, or to any of their members or employees, individually or collectively, for any acts or omissions of the charter school” and “[n]either the local school district, the charter entity nor the state shall be liable for the debts or financial obligations of a charter school or any person or corporate entity who operates a charter school.”
Charter schools and public benefit corporations share another characteristic that distinguishes them from political subdivisions: their definition is not inherently tied to a territorial subdivision of the State. The Court of Appeals has held that
“[t]he very idea of a distinct civil and political division of a State, necessarily implies a part of the State set apart and separated from every other part *261 for a special purpose, compact and united, and not separated and divided by intervening territory, and other divisions, under separate and distinct local organizations” (Bolton, 55 NY at 66; Markey, 154 NY at 680; see also Collins, 62 NY2d at 367-370 [civil divisions]).
The Attorney General relied upon this characteristic in opining that the term “political subdivision” used in article V, § 1 is not “equivalent [or] interchangable’’ with the term “public corporation” used in article X, § 5: “Political subdivisions are units whose limits are geographical. Public corporations are units whose bounds are drawn on functional lines” (1959 Ops Atty Gen 55 [internal quotation marks omitted]). As with public benefit corporations, the bounds of charter schools are drawn on functional, rather than geographical, lines.[11]
While the Attorney General now claims, in a footnote, that courts have not adhered to this distinction, that contention does not withstand scrutiny. The Court of Appeals expressly relied upon the opinion of Attorney General Lefkowitz in holding that a public benefit corporation is not a “political subdivision[ ] of the State” within the meaning of article V, § 1. (Patterson at 724.)
Respondents attach significant weight to the fact that charter schools receive public funding, thereby implicating the Comptroller’s responsibility to superintend the fiscal concerns of the State. A school district is required to pay tuition for each child attending a charter school, in an amount computed by reference to the per capita approved operating expenditures of the school district (Education Law § 2856 [1] [a]; see § 3602 [1] [f]). Charter schools may also receive and utilize private funds and are expressly authorized to accept gifts, donations or grants of any kind (Education Law § 2856 [3]). The evidence put forward by respondents demonstrates *262 that tuition payments from local school districts are the primary (but not exclusive) funding source for the petitioner charter schools.
However, respondents cite no authority for the proposition that the receipt of public funds transforms a corporate entity into a political subdivision of the State. Indeed, such a result would come as a great surprise to the many not-for-profit groups, health care providers and institutions of higher education funded in whole or in part by public funds.
In any event, it is beyond dispute that public benefit corporations have a substantial impact on the state fisc. Approximately $40 billion in outstanding debt issued by public authorities is supported by the State, at an annual cost to state taxpayers in excess of $3.5 billion (Office of State Comptroller, Debt Impact Study, at 15, 25 [Jan. 2008], available at http://osc.state.ny.us/ reports/debt/debtimpactstudy08.pdf [accessed May 23, 2008], cached at http://www.nycourts.gov/reporter/webdocs/ debtimpactstudy08 .pdf). The State also appropriates more than $100 million each year directly to public authorities to support their operations (Office of State Comptroller, State Financial Assistance to Public Authorities for the Fiscal Year Ending March 31, 2007, available at http://www.osc.state.ny.us/pubauth/ data/financialassistanceO33107.htm [accessed May 23, 2008], cached at http://www.nycourts.gov/reporter/webdocs/ financialassistance033107.htm). Thus, if an entity’s status as a political subdivision were determined by reference to its receipt of public funding or its fiscal impact on the State, public benefit corporations would be political subdivisions within the meaning of article V, § 1; yet they are not.
Charter schools and public benefit corporations also share similar statutory language reciting that they perform a public and governmental purpose and providing an exemption from taxation. Thus, pursuant to the act, the powers granted thereunder “constitute the performance of essential public purposes and governmental purposes of this state” and a charter school shall be exempt from taxation to the same extent as other public schools (Education Law § 2853 [1] [d]). Similar language appears in the enabling statutes of many public benefit corporations (see e.g. Public Authorities Law § 566 [Triborough Bridge and Tunnel Authority]; § 1020-p [Long Island Power Authority]; § 1685 [Dormitory Authority]). Thus, this language cannot serve to distinguish charter schools from public benefit corporations.
*263 In this connection, the court rejects respondents’ contention that a charter school must be deemed a “political subdivision” by dint of its status as a “public school.” The act refers to charter schools as “independent and autonomous public school[s]” (Education Law § 2853 [1] [c]), and defines the powers and duties of charter schools in several respects by reference to those “other public schools” (see e.g. Education Law § 2854 [1] [b], Ed]).
At the same time, however, the act deems a “charter school” to be a private school for certain purposes. Thus, with respect to student transportation, the provision of textbooks and educational materials, and issues of local zoning and land use regulation, the act deems a charter school to be a private school (see Education Law § 2853 [3] [a]; [4] [a]). Similarly, a charter school is treated as a private employer in many respects. Further, unlike a school district, a charter school is an “education corporation,” which the Commissioner of Education recognizes as the equivalent of a not-for-profit corporation (see Appeal of Stayton, supra).
Nonetheless, the court agrees with respondents’ basic point in this regard: a charter school is a public school, albeit one operated by an independent education corporation governed by the Not-For-Profit Corporation Law, rather than a political subdivision. A charter school is open to all of the children of this state who wish to attend (subject only to available space). Its organizers and operators commit to provide a high quality education at no charge or expense to students or their families. Admission to a charter school cannot be limited on the basis of intellectual ability, measures of achievement or aptitude, athletic ability, disability, race, creed, gender, national origin, religion, or ancestry. A charter school must offer a nonsectarian education and cannot be under the control of a religious organization. These characteristics amply support the designation of a charter school as a “public school.”
However, the fact that a charter school properly is considered a “public school” is no more determinative of its status as a political subdivision than is the denomination of “public benefit corporations” or “public corporations” (see NY Const, art X, § 5). Further, while education historically has been recognized as a public function, not every entity that provides educational services to the public is the State or a political subdivision, even *264 where public funds are used.[12] Rather, as with public benefit corporations, the Legislature authorized charter schools to carry out a particular public purpose in an independent and autonomous manner through a separate corporate entity, so as to provide freedom and flexibility and to insulate the government from liability (see Plumbing, Heating, Piping & A.C. Contrs. Assn., 5 NY2d at 423-424; Patterson, 41 NY2d at 724).
The dissimilarities between charter schools and public authorities also are instructive. In many important respects, a public authority is far closer to a state or local agency than a charter school. Indeed, unlike a public authority, a charter school lacks any of the sovereign powers traditionally associated with government, including the power to tax, the power of eminent domain and the police power.
While public benefit corporations do not have the power to levy taxes, they generally possess broad authority “to collect rentals, charges, rates or fees for the services or facilities furnished or supplied by it” (see NY Const, art X, § 5). A charter school, in contrast, cannot charge for the educational services that it provides (Education Law § 2854 [2] [a]). Further, a charter school lacks any discretion to establish its own student fees (though it may impose fees on the same basis and to the same extent as other public schools) (id.).
Another recognized sovereign power is that of eminent domain. Many public benefit corporations have been granted such power (see e.g. Matter of Metropolitan Transp. Auth. v American Pen Corp., 94 NY2d 154 [1999]). Charter schools, however, cannot exercise the power of eminent domain (Education Law § 2853 [1] [e]). In fact, with respect to issues of zoning and land use, a charter school is deemed to be a private school (§ 2853 [3] [a]).
Certain public authorities have been granted the police powers of the sovereign, including the power to establish their own police departments and confer upon their employees the powers of “police officers” (see e.g. Public Authorities Law § 1204 [16] [New York City Transit Police, subsequently merged into the *265 New York Police Department]; § 1299-e [13] [Niagara Frontier Transportation Authority security officers]). While a charter school undoubtedly carries out a public purpose in providing educational services, the provision of an education never has been considered a uniquely government function or the exercise of an inherently sovereign power.[13] Indeed, there is a long history of nonpublic education in New York State.
In addition to lacking the traditional powers of the sovereign, there is another significant distinction between charter schools and public benefit corporations. Members of the governing body of a public benefit corporation generally are selected by government officials (see generally Public Authorities Law). Further, in many cases, government officials serve as members of the governing body in an ex officio capacity. In contrast, the teachers, parents, school administrators and community residents who organize and establish a charter school determine the composition of the initial board of trustees and the manner in which future trustees shall be selected (Education Law § 2851 [1], [2] [c]). Further, the act makes no provision for ex officio members.
The manner in which public benefit corporations and charter schools are created also is worthy of mention. Public benefit corporations generally are created by special act of the Legislature {see generally Public Authorities Law; see also NY Const, art X, § 5). In contrast, charter schools obtain a charter through an administrative process and are formed as “education corporations” with virtually all of the attributes of a private not-for-profit corporation. Most, if not all, recognized political subdivisions are established by the State Legislature in statute.
While the court has focused extensively on a comparison with public authorities, the same legal and functional characteristics of charter schools discussed in that connection — including the interposition of a separate and independent corporate entity for increased flexibility and protection from liability; the lack of a defined, contiguous geographic territory; and the lack of the recognized sovereign powers of taxation, eminent domain and the police power — also serve to distinguish charter schools from recognized political subdivisions.[14]
*266 Based on the foregoing, the court concludes that a charter school is not a “political subdivision of the state” within the meaning of article V, § 1 of the New York Constitution.
B. Incidental Authority
In the alternative, respondents contend that the duty of auditing charter schools is incidental to the Comptroller’s function of supervising the accounts of school districts. Respondents assert that the tuition payments made by school districts to charter schools consist of public funds collected by the district through the local property tax levy, as well as state education funds appropriated to the school district. On this basis, respondents contend that the financial condition and efficacy of charter schools implicates the Comptroller’s responsibility to superintend the fiscal concerns of the State.
New York Constitution, article Y, § 1 provides that “[t]he legislature shall assign to [the Comptroller] no administrative duties, excepting such as may be incidental to the performance of [the foregoing] functions, any other provision of this constitution to the contrary notwithstanding.” Thus, in addition to establishing the mandatory and permissive functions of the Comptroller, article Y, § 1 goes on to establish a general rule broadly prohibiting the Legislature from assigning the Comptroller administrative duties, subject only to a limited exception for duties “incidental” to the performance of constitutionally authorized functions.
*267 In Blue Cross & Blue Shield of Cent. N.Y. v McCall (supra), the Court of Appeals held that the plain language and history of article V, § 1 compelled the conclusion that the audit of not-for-profit health insurers was an administrative duty not incidental to the Comptroller’s core functions (89 NY2d at 163, 171). The Court first recognized the State’s long history of regulating the business of insurance through the State Insurance Department (SID) and the broad regulatory and audit powers possessed by that agency. Since the challenged insurance audits were within the administrative purview of SID, the Court reasoned, the same duties must be considered “administrative” when performed by the Comptroller {id. at 167).
In rejecting the Comptroller’s contention that the “administrative” duties referred to in the constitutional provision referred only to “nonauditing activities,” the Court of Appeals explained that this argument ignored the overriding principles of efficiency, consolidation and accountability that led to the adoption of article Y, § 1 {id. at 168). Indeed, the Court observed that such audits had been the exclusive domain of the SID prior to and following the adoption of article Y, § 1.
The Court of Appeals further concluded that audits of not-for-profit health insurers could not be considered “incidental” to the Comptroller’s responsibility to superintend the State’s finances {id. at 167). While the Court did not dwell on this point, it did reject the Comptroller’s argument that the courts should defer to the Legislature’s judgment that the challenged audits were required to respond to “a matter of significant government concern” {id. at 170).
The Comptroller’s brief to the Court of Appeals in that case went further, however, contending that the audit of not-for-profit health insurers did, in fact, implicate the fiscal concerns of the State. The Comptroller argued that insurers such as Blue Cross “are heavily subsidized by State taxpayers through tax breaks and other statutory benefits. Although this State support is structured through a complex statutory arrangement of indirect benefits, the State’s interest is no less substantial than if public funds were simply paid to [the insurers]” (Blue Cross & Blue Shield of Cent. N.Y. v McCall, brief for appellants at 19 [emphasis added]; see also Consumers Union of U.S., Inc. v State of New York, 5 NY3d 327, 353-354 [2005] [recognizing the “billions of dollars” in such indirect benefits recaptured by the State from the conversion of a not-for-profit health insurer to a for-profit corporation]).
*268 The Comptroller in Blue Cross also attempted to support his position by reference to the need to respond to the growing trend of using private entities to carry out public functions at public expense (Blue Cross & Blue Shield of Cent. N.Y. v McCall, brief for appellants at 43), a scenario not dissimilar from the instant case (though charter schools rely on a combination of public and private funds).
Whatever the outer bounds of the Legislature’s authority to assign the Comptroller duties “incidental” to his function of supervising the accounts of the State and political subdivisions, the court concludes that this grant of incidental authority cannot be construed to authorize the Comptroller to conduct audits of charter schools. The clear intent of article V, § 1 is to confine the Comptroller to the core functions set forth in that section. To characterize the Legislature’s grant of full fiscal and programmatic audit authority over the 200 charter schools authorized by the act — including evaluation of student educational performance — as “incidental” puts far more weight on the term than it reasonably can bear.
Under the expansive view of “incidental” power advanced by respondents, the Legislature would be free to extend the Comptroller’s audit authority to any entity, public or private, that receives some or all of its funding from the State or local governmental sources. Respondents cite no case law or historical support for this unprecedented expansion of the Comptroller’s mission.[15] In fact, in Matter of New York Pub. Interest Research Group v New York State Thruway Auth. (77 NY2d 86 [1990]), the Court of Appeals rejected a similar argument, holding that the Legislature is not empowered to assign the Comptroller supervisory powers and duties pursuant to article Y, § 1 with respect to funds held by a public benefit corporation, even where such funds were derived from the state fisc (see also Matter of Smith v Levitt, 30 NY2d 934 [1972]).[16]
In this connection, the court rejects respondents’ reliance on Matter of Dinallo (supra) for the proposition that the Comptrol *269 ler’s audit authority extends to any activities that affect the state fisc. In Dinallo, the Court of Appeals held that “because the liquidation of a distressed insurer has no impact on the state fisc, it does not implicate the Comptroller’s . . . authority to superintend the fiscal affairs of the State” (9 NY3d at 102). However, the contrapositive does not follow.
The issue in Dinallo was whether the Comptroller’s audit authority extends to the Superintendent of Insurance when acting as the liquidator of a private insurer. The Court necessarily relied upon the lack of state fiscal impact in concluding that the Superintendent was not acting as a state officer in such capacity and that the funds under his control were not state funds (id.). There is no claim here that the funds lawfully held by a charter school, including tuition payments received from local school districts (a portion of which is derived from the state fisc), are “mone[ies] of the state” or “mone[ies] under its control.”
Moreover, had the framers of article V, § 1 intended such a sweeping grant of authority, they could easily have made that intent clear (cf. Pa Const, art VIII, § 10 [“The financial affairs of any entity funded or financially aided by the Commonwealth . . . shall be subject to audits”]). Indeed, respondents’ construction of article Y § 1 would render superfluous its express grant of authority to assign the Comptroller the duty of auditing political subdivisions. Under respondents’ theory, these audits would be incidental to the Comptroller’s function of superintending the State’s finances, since the State makes substantial appropriations every year to political subdivisions (see BarriosPaoli, 93 NY2d at 104).
To be sure, the Comptroller’s broad audit power over political subdivisions permits him to inquire into the efficiency and effectiveness of a school district’s expenditure of public funds (see Worth Constr. Co., Inc., 8 NY3d at 552; Barrios-Paoli, 93 NY2d at 106-107). However, a school district’s tuition payment to a charter school is not an expenditure over which the district exercises any measure of discretion or control. A school district is not required to approve a charter school (though it may act as a charter entity under the act), it has no say in a child’s decision to attend a charter school and it does not negotiate or otherwise determine the amount of tuition to be paid to a *270 charter school. Under these circumstances, the broad grant of fiscal and programmatic audit authority over charter schools conferred by chapter 267 of the Laws of 2005 cannot be considered incidental to the Comptroller’s function of auditing school districts or his other constitutionally prescribed functions.[17]
As in Blue Cross, there also is a long history of another state agency being charged with the type of auditing and oversight duty at issue in this proceeding. Prior to the adoption of article V, § 1 and continuing, the Board of Regents has been vested with the power to “visit, examine into and inspect, any institution in the university [of the state of New York] and any school or institution under the educational supervision of the state” (Education Law § 215). The Board of Regents also exercises broad powers, legislative in nature, with respect to the regulation of education institutions, public and private, in New York State (Education Law § 207). Indeed, the audits that the Comptroller seeks to conduct here, which focus on the quality of the education provided to students by charter schools, fall within the special competency of the Board of Regents.
While not dispositive of the constitutional issue, the Court of Appeals recognized in Blue Cross that this type of long history of audit and regulation by another department of state government is relevant to construing article V, § 1 in a manner consistent with the reform principles that led to its adoption:
“In fact, defendants’ argument [in favor of allowing the Comptroller to audit not-for-profit health insurers] ignores the overriding principles which guided the government restructuring in 1925 — to delineate the lines of responsibility and control spiraling government costs. In listing the underlying principles for the ‘Proposed Plan of Retrenchment,’ a bipartisan panel stated: ‘[b]ecause of the enormous *271 growth in expenditures and the small prospect under present state organization and procedures of preventing excessive increases in the future, it is necessary to impress upon the people of the State the need of retrenchment and reorganization’ (see, Report of Reconstruction Commission to Governor Alfred E. Smith on Retrenchment and Reorganization in the State Government [Oct. 10, 1919] [1919 Report] part I, at 3).
“The panel noted that the present administrative structure was ‘a miscellaneous collection of 187 offices, boards, commissions, and other agencies’ without direct or effective supervision (1919 Report, at 6). In creating its government restructuring proposal, the panel was primarily concerned with the ‘retrenchment and responsibility in the government of the State of New York’ which it concluded could be ‘achieved only through’ certain steps which included (1) the consolidation of the myriad of then existing administrative departments, commissions, offices, boards and other agencies and (2) the grouping of related offices and work in each of several departments into appropriate divisions and bureaus (1919 Report, at 11). Despite such a directive, the Legislature did not simply assign all auditing duties to the Comptroller.” (89 NY2d at 168.)
Further, while the court fully recognizes and appreciates the State’s substantial interests in ensuring that public monies are used in an effective and efficient manner and in preventing against fraud, waste and abuse, the extensive oversight provisions in the act ensure that these objectives can be accomplished even without the participation of the Comptroller. The act imposes upon the Board of Regents and the charter entity the duty to oversee each charter school they approve and confers upon them broad authority to “visit, examine into and inspect” the charter school and its records (Education Law § 2853 [2]). Oversight “shall be sufficient to ensure that the charter school is in compliance with all applicable laws, regulations and charter provisions” (id.).[18]
*272 The act also establishes an additional level of oversight by-authorizing the local school district — in this case, the New York City Department of Education — to “visit, examine into, and inspect” charter schools located within the district (§ 2853 [2-a]).[19] This oversight by the Board of Regents, the charter entity and the local school district is in addition to the requirement that charter schools obtain independent audits at least once annually (Education Law § 2851 [2] [f]).
Finally, Blue Cross (supra) forecloses respondents’ contention that audits of charter schools by the State Comptroller are necessary to inform public policy deliberations in an area of substantial state concern (89 NY2d at 170).
Based on the foregoing, the court concludes that the Comptroller’s duty of auditing charter schools, set forth in General Municipal Law § 33 and Education Law § 2854 (1) (c), cannot be upheld on the basis that it is incidental to the Comptroller’s constitutionally assigned functions.
Conclusion
The court concludes that petitioners have met their heavy burden of establishing that General Municipal Law § 33 (2) and Education Law § 2854 (1) (c) violate article \( § 1 of the New York Constitution to the extent that such provisions authorize or direct the State Comptroller to conduct audits of charter schools. Petitioners have further established that the State Comptroller lacks the authority under article V, § 1 to conduct the audits referenced in the amended verified petition and complaint. The court has considered respondents’ remaining arguments and finds them to be without merit.
Accordingly, it is ordered that the motion of New York State United Teachers to appear as amicus curiae, in support of respondents’ position, is granted; and it is further ordered that respondents’ motion for summary judgment is denied; and it is further ordered and adjudged that General Municipal Law § 33 (2) and Education Law § 2854 (1) (c) are declared to violate article § 1 of the New York Constitution to the extent that such statutes authorize or direct the State Comptroller to audit charter schools; and it is further ordered, adjudged and decreed that the State Comptroller and the Office of the State Comptroller are permanently *273 enjoined from conducting or attempting to conduct the audits referenced in the amended verified petition and complaint and from seeking to audit charter schools pursuant to the authority set forth in General Municipal Law § 33 (2) or Education Law § 2854 (1) (c).

. The Education Law confers upon the Board of Regents exclusive authority to “incorporate any university, college, academy, library, museum, or other institution or association for the promotion of science, literature, art, history or other department of knowledge, or of education in any way” (Education Law § 216; see also 8 NYCRR 3.20 [“The incorporation by the Regents ... of colleges, universities and other post-secondary institutions of learning, of schools offering instruction at the levels from pre-kindergarten through secondary, and of libraries, museums and historical societies will be evidenced by the issuance of a charter. The incorporation of all other institutions and organizations having educational purposes deemed worthy of recognition and *238 encouragement by the Regents will be evidenced by the issuance of a certificate of incorporation”]).

. The definition of “education corporation” also includes corporations formed by special act of the Legislature for educational purposes and certain authorized foreign corporations (Education Law § 216-a [1] [b], [c]).

. Indeed, there is a dictum in a Third Department case that would support the proposition that the “zone of interest” standing test is inapplicable to *246 constitutional challenges (Burns v Egan, 117 AD2d 38, 43 [3d Dept 1986] [“we observe that the ‘zone of interest’ standing test . . . does not apply. Since plaintiffs challenge the constitutionality of the Act, the proper test is whether, in fact, the person claiming standing has been injured”]). In the present case, whether the standard applied is “zone of interest” or simply “injury-in-fact,” the result of the analysis is the same.

. The charter schools allege that their independence and autonomy will be impaired if the challenged audits go forward. More fundamentally, the schools will be forced to bear the fiscal and administrative burdens of participating in government audits conducted in the absence of legal authority.

. Before turning its attention to the merits, the court observes (but does not rely upon) the fact that a contrary conclusion regarding petitioners’ capacity to sue or standing would merely delay — and not obviate — the need for judicial resolution of the constitutional challenge raised by petitioners. If the court were to dismiss this action for lack of capacity or standing, it is highly likely that the petitioner charter schools would raise their constitutional objections to General Municipal Law § 33 (2) and Education Law § 2854 (1) (c) in the context of a judicial proceeding brought by the Comptroller to enforce compliance with his audit demands. Indeed, several of the prior constitutional challenges to the Comptroller’s audit authority have occurred in such a context (see Matter of McCall v Barrios-Paoli, 93 NY2d 99, 109-111 [1999]). Thus, the only thing that ultimately turns on the issues of capacity and standing is whether the charter schools are to be plaintiffs or defendants in a proceeding to determine the constitutional issues raised by this application.

. Accord Black’s Law Dictionary 1197 (8th ed 2004) (political subdivision is “[a] division of a state that exists primarily to discharge some function of local government”).

. While the Constitution of 1894 did not use the term “political subdivision,” it did refer to a “political division” (art III, § 29 [governing the use of prison labor]) as well as “civil divisions” (art V, § 9 [governing civil service appointments and promotions]). The meaning of the term “civil division” is addressed infra.

. With respect to public corporations, article X, § 5, added in 1938, provides: *249 “Neither the state nor any political subdivision thereof shall at any time be liable for the payment of any obligations issued by such a public corporation heretofore or hereafter created, nor may the legislature accept, authorize acceptance of or impose such liability upon the state or any political subdivision thereof; but the state or a political subdivision thereof may, if authorized by the legislature, acquire the properties of any such corporation and pay the indebtedness thereof.” Article VI, § 29, added in 1961, provides that the Legislature shall allocate the cost of the Judiciary “among the state, the counties, the city of New York and other political subdivisions” and requires the “counties, the city of New York or other political subdivisions” to provide itemized budgets of the courts that they are responsible for funding in the first instance.

. Indeed, in the Blue Cross & Blue Shield of Cent. N.Y. v McCall case, the Comptroller relied upon this fact in his argument to the Court of Appeals (see brief for appellants at 23 et seq., attached as exhibit 1 to affirmation of John J. Henry, dated Jan. 17, 2008).

. While respondents observe that “a particularized inquiry is necessary to determine whether — for the specific purpose at issue — the public benefit corporation should be treated like the State” (Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 387 [1987]), the same decision expressly recognizes that public benefit corporations are not “political subdivisions” (id. at 386). Further, while public benefit corporations may be deemed “political subdivisions” for purposes of certain statutes (but not others), the Court of Appeals holding in Patterson v Carey (supra) forecloses the argument that a public benefit corporation can be considered a “political subdivision” within the meaning of article V, § 1.

. Respondents also contend that a charter school does have geographical boundaries. In making this argument, respondents point to Education Law § 2851 (3) (a), which prohibits a board of education from acting as a charter entity for a school “to be operated outside the school district’s geographic boundaries.” This provision, however, constitutes a limitation only on the power of a board of education to approve a charter school outside of the district. Indeed, the act provides that “[a]ny child who is qualified under the laws of this state for admission to a public school is qualified for admission to a charter school” (Education Law § 2854 [2] [b]). Further, the act expressly contemplates the attendance of students from outside of the school district in establishing an enrollment preference for district residents in the event that applications for admission exceed available seats (see id.).

. For example, private not-for-profit schools established pursuant to chapter 853 of the Laws of 1976 (853 schools) provide educational and related services to children with handicapping conditions (see Education Law § 4001 et seq.; § 4401 et seq.). The 853 schools fulfill the State’s obligation to provide its students with a free and appropriate public education (see 20 USC § 1412) but, as with charter schools, lack the authority to tax (and other sovereign powers) and instead must depend on tuition payments from local school districts and social service districts (Education Law §§ 4003, 4405).

. While the power of compulsory education, the power to compel a child to attend a school, is sovereign in nature, enrollment in a charter school is a purely voluntary decision.

. The court declines respondents’ invitation to delve into the legal status of libraries in New York State. The status of a particular type of library *266 depends on its legal and functional characteristics, as well as the specific constitutional or statutory provision at issue. It is clear, however, that certain types of libraries chartered by the Board of Regents as education corporations are not considered political subdivisions of the State (see e.g. French v Board of Educ. of Three Vil. Cent. School Dist., 99 Misc 2d 882, 887 [Sup Ct 1979] [“free association Library” chartered by Board of Regents is not a political subdivision for purposes of competitive bidding requirements], affd 72 AD2d 196, 199 [2d Dept 1980]; 1971 Ops Atty Gen 15 [“On the other hand, the Nassau Library System, a cooperative library system, chartered by the Board of Regents . . . , created for the purpose of providing expanded and improved library services economically in Nassau County, is a legal entity separate and distinct from any governmental agency”]; 1961 Atty Gen [Inf Ops] 105 [“A library chartered by the Board of Regents is not a municipality nor a civil nor a political subdivision of the State. It is a corporation”]; 1959 Atty Gen [Inf Ops] 150 [“(I)t is my view that the 1923 law and the contract made thereunder . . . did not create the Albany Public Library as a political subdivision or an agency of a political subdivision of the State”]). Indeed, the only case cited by respondents in this connection (Matter of Beers v Incorporated Vil. of Floral Park, 262 AD2d 315 [2d Dept 1999]) expressly relies upon the foregoing line of authorities.

. Of course, any “payment of any money of the state, or of any money under its control” is subject to the Comptroller’s preaudit, so as to ensure that such payment is made in accordance with law (see NY Const, art V, § 1; 1948 Ops Atty Gen 237). In this case, the only payment of such funds occurred when state education aid was paid to the City of New York (see infra n 17).

. While the Court of Appeals did not focus on “incidental” authority in these cases or in Patterson v Carey (supra), it must necessarily have rejected reliance on such authority in consistently holding that article V, § 1 does not *269 authorize the Legislature to prescribe the Comptroller’s powers and duties with respect to public benefit corporations.

. The court expresses no view on whether the Comptroller’s incidental authority associated with his functions of auditing school districts and charter entities and preauditing the expenditure of state funds might extend to more limited inquiries of charter schools. For example, the act requires that “[t]he enrollment of students attending charter schools shall be included in the enrollment, attendance, membership and, if applicable, count of students with disabilities of the school district in which the pupil resides” and requires the charter school to “report all such data to the school districts of residence in a timely manner” (Education Law § 2856 [1] [a]). Thus, the Comptroller might seek to confirm the accuracy of this reported data in the context of a preaudit of the payment of state aid to the school district or as part of an audit of tuition payments made by the school district to the charter school.

. The manner in which the Board of Regents and other charter entities discharge their supervisory and oversight responsibilities is a proper subject of the Comptroller’s audit power, and the State Legislature is free to enact corrective legislation in response to any identified deficiencies. If the Legislature ultimately concludes, as a matter of sound public policy, that the participation *272 of the Comptroller is essential to the process of supervising and overseeing charter schools, it is empowered to initiate the process of constitutional revision.

. In some cases, the local school district will be the charter entity.