*102
 
 OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 This appeal centers on a challenge to the authority of the State Comptroller to conduct performance audits of New York City agencies. Like Supreme Court and the Appellate Division, we conclude that the Comptroller has authority to perform such audits.
 

 While the State Comptroller has long been empowered to audit other political subdivisions of the State, it was not until 1971 that the Legislature authorized examinations of New York City and its agencies (L 1971, ch 20). Acting on that authority, during the past quarter-century the Comptroller has conducted hundreds of City “performance audits,” which examine the performance of government organizations, programs, activities or functions “in order to provide information to improve public accountability and facilitate decision-making by parties with responsibility to oversee or initiate corrective action” (Government Auditing Standards § 2.6 [United States General Accounting Office 1994 Revision]).
 
 [1]
 
 In this period the Comptroller has also completed hundreds of City financial audits, which examine compliance with financial requirements and the adequacy of internal controls.
 

 In June 1991, the Deputy Comptroller and the City entered into a Memorandum of Understanding intended “[t]o formalize and commit to writing the performance audit protocol * * * practiced by the New York State Deputy Comptroller’s Office and all audited New York City agencies.” As provided in the Memorandum of Understanding, City performance audits were to be initiated by the Comptroller through an engagement letter setting forth the subject and scope of the proposed inquiry and inviting the scheduling of an entrance conference — an
 
 *103
 
 initial meeting to discuss the auditor’s methodologies and objectives.
 

 Between December 4, 1996 and April 11, 1997, the Comptroller’s office sent engagement letters to six City agencies (collectively the City) seeking information concerning their programs, activities and functions. The audits proposed to investigate, among other things, compliance with the law, the efficiency and accuracy of data-gathering systems, and the allocation of resources. Specifically, the Comptroller sought to examine:
 

 • the Department of Finance’s Industrial and Commercial Incentive Program to determine whether real property tax benefits were being provided in accordance with the law;
 

 • the Police Department (NYPD) to assess the adequacy and efficiency of the on-line complaint system for reporting crime complaint statistics, the data gathering and record keeping methodology used for reporting arrests, and the internal control systems in place for recording, compiling and reporting statistical information;
 

 • the Human Resources Administration to obtain information about the adequacy and efficiency of its systems for gathering data and reporting statistics on the number of people receiving public assistance who found employment;
 

 • the Taxi and Limousine Commission and the NYPD’s monitoring of medallion and for-hire vehicle drivers to determine whether summonses were being properly issued and tracked and evaluate the effectiveness of the Commission’s program for identifying unsafe drivers;
 

 • the Department of Health to obtain information about eating establishment inspections and determine the economy and efficiency with which inspections were being performed;
 

 
 *104
 
 • the Department of Health to evaluate the effectiveness of policies, procedures and controls for ensuring security over birth and death records and obtain information related to maintenance of these records to assess the feasibility of consolidation or coordination of State and City vital records functions; and
 

 • the Administration for Children’s Services to assess the adequacy of caseworker hiring, training and supervision and ascertain compliance with State regulations concerning these functions.
 

 Claiming that the Comptroller lacked authority to inquire into the management and operations of the agencies, and that the proposed audits were politically motivated, the City declined to provide representation letters or schedule entrance conferences. The City further discontinued ongoing audits by denying access to work sites in City offices. In an effort to compel cooperation, the Comptroller issued administrative subpoenas to the named agencies, and upon their refusal to comply sought judicial enforcement of the subpoenas.
 

 Supreme Court granted the Comptroller’s motion to compel compliance with the subpoenas. The court held that the proposed audits:
 

 “pertain to activities that have a clear and direct relation to the financial condition of and the use of resources by the given City agency. An inquiry into an agency’s financial condition and resources surely includes examination and evaluation of the efficiency and economy of the uses of such resources.”
 

 The Appellate Division affirmed for the reasons stated by Supreme Court. On the City’s appeal, we now affirm.
 

 Analysis
 

 The State has far-reaching responsibility for programs and services of its political subdivisions, each year appropriating significant public monies to local governments. The Comptroller — the State’s chief fiscal officer — is a vital part of the constitutional machinery for assuring accountability in the expenditure of those funds. In furtherance of the unique, fundamental duty to superintend the fiscal concerns of the State, the Comptroller conducts audits of the State’s political subdivisions
 
 (Blue Cross & Blue Shield v McCall,
 
 89 NY2d 160, 166).
 

 
 *105
 
 Authority to monitor use of State funds through audits of political subdivisions derives from two sources: the State Constitution and State statutes. The Constitution generally empowers the Legislature to assign to the Comptroller “supervision of the accounts of any political subdivision of the state * * * [and administrative duties] as may be incidental to the performance of these functions” (NY Const, art V, § 1). General Municipal Law § 33 more particularly provides:
 

 “The comptroller shall cause the accounts of all officers of each such municipal corporation * * * to be inspected and examined by one or more examiners of municipal affairs for such periods as the comptroller shall deem necessary. On every such examination inquiry shall be made as to the financial condition and resources of the municipal corporation * * * and into the method and accuracy of its accounts.”
 

 General Municipal Law § 34 further authorizes the Comptroller “to examine into the financial affairs of every such municipal corporation.” Neither the Constitution nor the statutes specify what sort of audits the Comptroller may conduct.
 

 In support of its challenge, the City points to the absence of explicit authority for performance audits in the Constitution and statutes, and to the presence of the word “accounts” in both sources. “Accounts,” the City argues, has a plain, precise, narrow meaning, signifying financial matters and a corresponding limitation of the Comptroller’s audit authority. We find the City’s argument unpersuasive, concluding both that the Constitution permits delegation to the Comptroller of the authority to conduct performance audits of political subdivisions, and that in exercise of that authority the Legislature has empowered the Comptroller to conduct such audits of City agencies.
 

 The State Constitution Permits the Delegation
 

 Article V, § 1 of the State Constitution is a wellspring of the Comptroller’s authority. The provision does not specify financial audits, performance audits or indeed audits at all, but broadly empowers the Legislature to delegate to the Comptroller both supervision of the accounts of any political subdivision of the State and administrative duties incidental thereto.
 

 The City zeroes in on a single word of the constitutional provision — “accounts”—urging that both in the abstract and in the
 
 *106
 
 context of the history of the provision, only financial audits were intended. As for the isolated word “accounts,” as well as the key constitutional phrase “supervision of the accounts,” we cannot agree that the meaning is so plain and precise as to signify financial audits and prohibit performance audits. Indeed, as we noted in
 
 Matter of Edge Ho Holding Corp.
 
 (256 NY 374, 380), “it is hard to think of a situation in which incompetence or laxity so general as to amount to proof of method will not also have direct relation to the accounts of the department or office subject to the criticism, since the wages of the assistants are wastefully expended if reasonably efficient service is not rendered in return” (see
 
 also, Ward Telecommunications & Computer Servs. v State of New York,
 
 42 NY2d 289, 290).
 
 [2]
 

 Thus, use of the word “accounts” and the phrase “supervision of the accounts” in article V, § 1 does not restrict the Comptroller to financial audits or preclude inquiry into the efficiency and effectiveness of the City’s expenditure of State funds. Authority to supervise the accounts of the State’s political subdivisions leaves ample room for wider inquiry by the Comptroller.
 

 Nor does our constitutional history evince an intent to so limit the Comptroller’s core authority to financial audits. Review of the duties performed by the Comptroller prior to, contemporaneously with and after adoption of article V, § 1 makes clear that authority to supervise “accounts” has never been confined to examinations of a municipality’s financial records but has included the broader inquiry contemplated by performance audits. .
 

 In 1925, when the Constitution was amended for the first time to describe the Comptroller’s responsibilities with respect to political subdivisions, the duties of the Office already included:
 

 “the examination, investigation and audit of [municipal] fiscal accounts and affairs * * * to see that controlling statutes [were] observed, that the local
 
 *107
 
 activities [were] economically and efficiently administered, to call attention to and correct illegal and irregular practices, and to advise improvements where possible” (1925 Annual Report of Comptroller, 1926 NY Legis Doc No. 8, part 1, at xviii;
 
 see also,
 
 1924 Annual Report of Comptroller, 1925 NY Legis Doc No. 8, part 1, at xxv).
 

 Rather than an intent to limit the Comptroller’s core functions, article V, § 1 had as its object protection of the independent character of the Comptroller’s audit function. This was accomplished both by preventing the assignment of additional, unrelated duties (such as the accrual and collection of taxes and revenues) and by permitting the assignment of supervision of the accounts of political subdivisions and administrative duties incidental thereto (Report of Reconstruction Commn to Governor Alfred E. Smith on Retrenchment and Reorganization in the State Government [Oct. 10, 1919], 1920 NY Legis Doc No. 51, at 53-54;
 
 see also, Blue Cross & Blue Shield v McCall, supra,
 
 89 NY2d at 167-168).
 

 The constitutional amendment of 1925 was followed immediately by a legislative commission constituted to recommend coordinate statutory changes. Recognizing that the constitutional amendment did not necessitate changes in the Comptroller’s duties with regard to oversight of municipal “accounts,” the Commission advised that “[p]ursuant to the provisions of the constitutional amendment *
 
 *
 
 * the duties which at present devolve upon the Comptroller, of supervising the accounts of the various political subdivisions of the State shall be continued” (Report of State Reorganization Commn, 1926 NY Legis Doc No. 72, at 24). As such the Comptroller’s duties, which included performance examinations, remained unchanged.
 

 Subsequent reports reflect that the relationship between the Comptroller and municipalities was of “an advisory and helpful nature” (4 Report of 1938 New York State Constitutional Convention Committee on State and Local Government in New York, at 341). At the time of the 1938 Constitutional Convention — ultimately resulting in our current Constitution — the Comptroller remained responsible for examining “accounts for the purpose of ascertaining the Accuracy of the records and the legality of the payment of claims, together with such other investigation as may be necessary in order to determine the efficiency of administration in so far as the fiscal affairs of such municipality are concerned”
 
 (id.).
 
 Again, the drafters took no action to reframe or restrict the Comptroller’s powers.
 

 
 *108
 
 Thus, we conclude that article V, § 1 permits the delegation of authority to conduct performance audits of political subdivisions of the State.
 

 The Legislature Authorized Perfomance Audits
 

 Like the Constitution, the General Municipal Law neither explicitly authorizes nor explicitly prohibits performance audits. Unlike the Constitution, however, the General Municipal Law provides certain particularity as to the State Comptroller’s powers. Sections 33 and 34 expressly authorize the Comptroller to examine the accounts of all municipal officers to inquire into the “financial condition,” “resources” and “method and accuracy of [the] accounts” of any municipal corporation, and to examine into its “financial affairs.” Clearly these powers go beyond the verification of financial records and internal controls. As noted in
 
 Ronan v Levitt
 
 (42 AD2d 10, 12,
 
 lv denied
 
 33 NY2d 514), interpreting analogous statutes, “courts of this State have been extremely liberal in construing legislation designed to provide a system of financial checks and balances, particularly in the area of governmental agencies and public authorities.”
 
 [3]
 

 The history of the statutes, moreover, unambiguously demonstrates that the Legislature expected the State Comptroller might conduct audits into the effective use of State funds by political subdivisions. In signing the 1971 amendments to the General Municipal Law that added New York City (as well as Buffalo and Rochester) to the statute’s reporting and auditing requirements, for example, the Governor noted that “[u]niform Statewide audits of all levels of local government required by the bill can provide a great contribution to efficient and economic administration and use of the taxpayers’ dollar” (Governor’s Mem of Approval, Bill Jacket, L 1971, ch 20, reprinted in 1971 McKinney’s Session Laws of NY, at 2605). As the Governor had observed in seeking that legislation, “sixty-three cents of every tax dollar [the State collects] goes back to the local governments to help them meet their responsibilities,” and it is the State’s responsibility to see “that perfor
 
 *109
 
 manee standards set by the Legislature in connection with * * * State-supported services are lived up to by local government” (1971 Public Papers of Nelson A. Rockefeller, at 60). The Division of the Budget, in recommending that the Governor sign the bill, echoed the sentiment that the Comptroller’s audits would enable the State to fulfill its “responsibility to insure the efficient and effective use” of the City’s funds and “help promote efficiency in their financial administration” (Mem of Div of Budget, Bill Jacket, L 1971, ch 20).
 

 As a final argument, the City notes the explicit authority of the City Comptroller, under the City Charter, to conduct such audits, urging that the Legislature did not intend to duplicate those powers. That argument is flawed. First, the provision upon which the City relies was enacted by the people of the City, and as such obviously did not displace the State Comptroller’s authority under General Municipal Law §§ 33 and 34. Second, there is nothing to suggest that the State Legislature intended that performance audits of the City would be conducted exclusively by the City Comptroller. Indeed, in 1985, the Legislature established the Office of the Deputy Comptroller for the City of New York as a permanent division within the Office of the State Comptroller, unambiguously evidencing its intention that the State Comptroller have the power to inquire into the operations of the City and its agencies irrespective of the City Comptroller’s coextensive powers
 
 (see,
 
 Executive Law § 41-a). Finally, the City concedes that the State Comptroller is authorized to conduct
 
 financial
 
 audits of City agencies — a duty similarly assigned by the City Charter to the City Comptroller.
 

 We therefore hold that by enacting General Municipal Law §§ 33 and 34, the Legislature authorized the State Comptroller to conduct performance audits of political subdivisions of the State, including the City.
 

 Having determined that performance audits of political subdivisions, including the City, lie within the Comptroller’s authority, we conclude on a note of caution. Before us, the City objects to the subpoenas only insofar as they permit the Comptroller to conduct performance audits. The City does not more particularly challenge the proposed examinations that triggered this litigation. We therefore have no occasion to pass on the specifics of the proposed audits or address any other issues that might, in individual instances, circumscribe the authority we recognize today.
 

 
 *110
 
 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Judges Bellacosa, Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order affirmed, with costs.
 

 [1]
 

 . Performance audits may be of two types. “Economy and efficiency audits” inquire into the efficiency with which resources are allocated, causes of inefficiencies, and compliance with laws and regulations on matters of economy and efficiency (Government Auditing Standards § 2.7 [United States General Accounting Office 1994 Revision]). “Program audits” assess the effectiveness of governmental programs, the extent to which they obtain desired results, and their compliance with applicable laws and regulations
 
 (id.).
 

 [2]
 

 . In
 
 Matter of Edge Ho (supra,
 
 256 NY at 379), the Court addressed the scope of the City Commissioner of Accounts’ powers. Although the Commissioner was statutorily authorized to examine both “the accounts and methods of the departments and offices of the city,” appellants argued that the Commissioner could not inquire into efficiency of methods absent a direct relation to accounts. The Court rejected that argument because the Commissioner was expressly empowered to examine either “accounts” or “methods,” and because “accounts” and “methods” were interrelated.
 

 [3]
 

 . Contrary to the City’s argument,
 
 Patterson v Carey
 
 (41 NY2d 714, 723-724), did not overrule
 
 Ronan.
 
 In Patterson, this Court concluded that a statute requiring the Comptroller to review and report on a public authority’s proposed toll increases impermissibly added to and thereby infringed on the Comptroller’s responsibilities under article X, § 5 of the State Constitution. We did not address the Comptroller’s power to audit ongoing operations of political subdivisions.