[914 NE2d 991, 886 NYS2d 74]

In the Matter of New York Charter Schools Association, Inc., et al., Appellants, v Thomas P. DiNapoli, as Comptroller of the State of New York, et al., Respondents.

Argued June 2, 2009; decided June 25, 2009

POINTS OF COUNSEL

*Simpson Thacher & Bartlett LLP,* New York City (*Joseph F. Wayland* of counsel), and *Whiteman Osterman & Hanna LLP,* Albany (*John Henry* of counsel), for appellants. I. The Comptroller of the State of New York's powers are limited by article V, § 1 of the New York State Constitution. (*Matter of McCall v Barrios-Paoli,* 93 NY2d 99; *Blue Cross & Blue Shield of Cent. N.Y. v McCall,* 89 NY2d 160; *County of Rensselaer v Regan,* 151 Misc 2d 552; *Patterson v Carey,* 41 NY2d 714; *Matter of New York Pub. Interest Research Group v New York State Thruway Auth.,* 77 NY2d 86.) II. Charter schools are not political subdivisions. (*Matter of McCall v Barrios-Paoli,* 93 NY2d 99; *Markey v County of Queens,* 154 NY 675; *People ex rel. Williams Eng'g & Contr. Co. v Metz,* 193 NY 148; *Gaynor v Marohn,* 268 NY 417; *People ex rel. Bolton v Albertson,* 55 NY 50; *Village of Kenmore v County of Erie,* 252 NY 437; *Matter of Worth Constr. Co., Inc. v Hevesi,* 8 NY3d 548; *John Grace & Co. v State Univ. Constr. Fund,* 44 NY2d 84; *Matter of Mena v D'Ambrose,* 44 NY2d 428;

*Matter of Corwin v Farrell,* 303 NY 61.) III. Audits of charter schools are not "incidental to" the Comptroller of the State of New York's supervision of the accounts of public school districts. *(Blue Cross & Blue Shield of Cent. N.Y. v McCall,* 89 NY2d 160; *Patterson v Carey,* 41 NY2d 714.)

*Andrew M. Cuomo, Attorney General,* Albany *(Andrew D. Bing, Barbara D. Underwood* and *Zainab A. Chaudhry* of counsel), for respondents. The Legislature's assignment to the Comptroller of the State of New York of charter school audits is permitted by the broad authority delegated to the Legislature in article V, § 1 of the State Constitution to shape the Comptroller's powers and duties regarding the State of New York and its political subdivisions. *(Matter of Worth Constr. Co., Inc. v Hevesi,* 8 NY3d 548; *Matter of McCall v Barrios-Paoli,* 93 NY2d 99; *La-Valle v Hayden,* 98 NY2d 155; *Schulz v State of New York,* 84 NY2d 231; *Matter of Dinallo v DiNapoli,* 9 NY3d 94; *Blue Cross & Blue Shield of Cent. N.Y. v McCall,* 89 NY2d 160; *Levitt v Wanamaker,* 12 AD2d 149; *Matter of ASA Inst. of Bus. & Computer Tech. v McCall,* 281 AD2d 849; *Matter of Elmira Bus. Inst. v New York State Dept. of Educ.,* 116 AD2d 133, 70 NY2d 758; *Palmer v Board of Educ.,* 276 NY 222.)

*James R. Sandner,* Latham, *Marilyn Raskin-Ortiz, Frederick K. Reich* and *Richard E. Casagrande* of counsel for New York State United Teachers, amicus curiae. I. The New York State Constitution authorizes the Legislature to broadly and comprehensively audit charter schools. *(Campaign for Fiscal Equity v State of New York,* 100 NY2d 893; *Reform Educ. Fin. Inequities Today [R.E.F.I.T.] v Cuomo,* 86 NY2d 279; *Matter of International High School: Charter School at LaGuardia Community Coll. v Mills,* 276 AD2d 165; *Gardner v Ginther,* 232 App Div 296, 257 NY2d 578; *Matter of Board of Educ. of Union Free School Dist. No. 1 of Towns of Bethlehem, Coeymans & New Scotland v Wilson,* 303 NY 107; *LaValle v Hayden,* 98 NY2d 155; *Matter of Dinallo v DiNapoli,* 9 NY3d 94.) II. The justification for upholding the New York State Comptroller's authority to audit charter schools is underscored by the experiences of states other than New York. *(United States v Pierce,* 479 F3d 546.)

**OPINION OF THE COURT**

CIPARICK, J.

In this appeal, we are called upon to determine whether the

Legislature violated article V, § 1 of the New York State Constitution when it assigned and directed the State Comptroller to audit charter schools. We hold that the Legislature exceeded its constitutional authority by delegating and directing the Comptroller to conduct audits of charter schools. Therefore, the order of the Appellate Division should be reversed.

## Background

In 1998, the Legislature enacted the New York Charter Schools Act (Act) thereby authorizing a system of charter schools to be created in New York State to provide "opportunities for teachers, parents, and community members to establish and maintain schools that operate independently of existing schools and school districts" (Mem in Support of 1998 NY Senate-Assembly Bill S7881, A11466, Bill Jacket, L 1998, ch 4). The Legislature found that creating a charter schools system would have no fiscal impact on the State because the "[f]unds are provided for within [the] annual appropriation for school aid" (*id.*).

Charter schools are "within the public school system" (Education Law § 2850 [2] [e]). Any child who is eligible for admission to a public school is qualified for admission to a charter school, and the charter school "shall enroll each eligible student who submits a timely application . . . unless the number of applications exceeds the capacity of the grade level or building" (Education Law § 2854 [2] [b]). A charter school cannot charge tuition or fees, except to the extent that fees are charged by other public schools, and shall be nonsectarian in its programs, admission policies and employment practices and is forbidden from engaging in any form of discrimination (*see* Education Law § 2854 [2] [a]).[1] Further, the Legislature has stated that "[t]he powers granted to a charter school under [the Act] constitute the performance of essential public purposes and governmental purposes of this state" (Education Law § 2853 [1] [d]).

Under this Act, teachers, parents, school administrators, community residents or any combination thereof may submit an application to establish a charter school (*see* Education Law § 2851

---

1. However, this section does allow for a "single-sex charter school or a charter school designed to provide expanded learning opportunities for students at-risk of academic failure" (*id.*).

[1]).[2] A charter school application may be filed in conjunction with a college, university, museum, educational institution, or a not-for-profit corporation exempt from taxation under paragraph (3) of subsection (c) of section 501 of the Internal Revenue Code or for-profit business or corporate entity authorized to do business in New York (*id.*). A charter school application must be submitted to, and receive approval from, a "charter entity" (*see* Education Law § 2851 [3]). The Act defines a "charter entity" as (1) the State Board of Regents; (2) the Board of Trustees of the State University of New York; (3) the board of education of a school district that encompasses the geographical boundary in which the charter school will operate; or (4) if the charter school is to be located within the City of New York, the Chancellor of the City School District (*id.*).

Education Law § 2851 (2) states that the application must specify information, such as its mission statement, a description of an educational program and a description of student achievement goals that meet or exceed the student performance standards adopted by the Board of Regents for other public schools. Further, the application must provide a proposed budget and fiscal plan for the school, including supporting evidence that the fiscal plan is sound and that sufficient start-up funds will be available to the charter school (*id.*). Education Law § 2851 (2) also provides that the charter school application disclose its requirements and procedures for conducting at a minimum annual programmatic and independent fiscal audits, that are comparable in scope to audits of other public schools.

Once the application of the proposed charter school has been approved by the charter entity, the Act requires that the organizers of the proposed charter school and the charter entity enter into a proposed written agreement—the "charter." The charter allows an applicant to organize and operate a charter school (*see* Education Law § 2852 [5]). Further, the charter must "include the specific commitments of the charter entity relating to its obligations to oversee and supervise the charter school" (*id.*). The Board of Regents, if not the charter entity, is required to give its final approval to all proposed charters before issuance (*see* Education Law § 2851 [3]; § 2852 [5], [5-a], [5-b]).

Once approved, the Board of Regents incorporates the charter school as an "education corporation" (*see* Education Law

---

2. An existing private school is not eligible to convert to a charter school (*see* Education Law § 2852 [3]).

§ 216-a [1] [a];[3] § 2853 [1]) governed by the Not-For-Profit Corporation Law (*see* Education Law § 216-a [4]) and its incorporation as an education corporation is "for a term not to exceed five years" (Education Law § 2853 [1] [a]). After the five-year term has expired, a charter school must apply for renewal of its charter by submitting a report detailing the progress of the charter school in achieving the educational objectives as set forth in its charter (Education Law § 2851 [4]). A charter school must provide a "detailed financial statement that discloses the cost of administration, instruction and other spending categories for the charter school that will allow a comparison of such costs to other schools, both public and private" (Education Law § 2851 [4] [b]), as well as copies of each of the annual reports of the charter school which include charter school report cards and certified financial statements (*see* Education Law § 2851 [4] [c]).

Indeed, a charter school has been deemed by the Legislature to be "an independent and autonomous public school" (Education Law § 2853 [1] [c])[4] and that the charter entity and the Board of Regents are "the public agents authorized to supervise and oversee the charter school" (*id.*). Further, a charter school is governed by a self-selecting board of trustees that has "final authority for policy and operational decisions of the school" (Education Law § 2853 [1] [f]). However, it falls both to the Board of Regents and charter entity to oversee each school approved pursuant to the Act "and both may visit, examine into and inspect any charter school, including the records of such school, under its oversight" (Education Law § 2853 [2]).

---

3.  Education Law § 216-a (1) (a) states the term
    " 'education corporation' . . . means a corporation (a) chartered or incorporated by the regents or otherwise formed under this chapter, or (b) formed by a special act of this state with its principal purpose an education purpose and which is a member of the university of the state of New York, or (c) formed under laws other than the statutes of this state which, if it were to be formed currently under the laws of this state, might be chartered by the regents, and which has been authorized to conduct its activities in this state by the regents or as an authorized foreign education corporation with the consent of the commissioner."
4.  There are certain instances in Education Law § 2853 in which the Legislature has determined a charter school should be considered a private school such as: (1) the power to designate textbooks, to purchase textbooks, to loan textbooks and to purchase supplies; (2) the designation of school library materials; (3) the designation of software programs to be used in conjunction with its computers; (4) local zoning, land use regulation, and building code compliance; and (5) student transportation.

Further, "[o]versight by a charter entity and the board of regents shall be sufficient to ensure that the charter school is in compliance with all applicable laws, regulations and charter provisions" (*id.*).

The Act imposes additional layers of oversight designed to ensure the charter school meets its educational responsibilities by giving the school district in which the charter school is located the right to visit, examine and inspect the charter school for the purpose of ensuring that the school is in compliance with all applicable laws, regulations and charter provisions (*see* Education Law § 2853 [2-a]). Any evidence of noncompliance uncovered by the school district during its inspection of the charter school may be forwarded to the Board of Regents and the charter entity for action, which can include revocation of the school's charter (*see id.*; *see also* Education Law § 2855).

In addition to being subject to inspection by the Board of Regents, the charter entity and the local school district, a charter school must submit an annual report to both the Board of Regents and to its charter entity. These reports include a charter school report card that outlines the measures of the comparative academic and fiscal performance of the school (*see* Education Law § 2857 [2] [a]). These

> "measures shall include, but not be limited to, graduation rates, dropout rates, performance of students on standardized tests, college entry rates, total spending per pupil and administrative spending per pupil. Such measures shall be presented in a format that is easily comparable to similar public schools" (Education Law § 2857 [2] [a]).

A charter school's annual report also must include "a certified financial statement setting forth . . . the revenues and expenditures for the preceding school year, including a copy of the most recent independent fiscal audit of the school" (Education Law § 2857 [2] [c]).

Charter schools are funded primarily with public monies.[5] The Act requires that the "school district of residence shall pay directly to the charter school for each student enrolled in the charter school who resides in the school district the charter school basic tuition" (Education Law § 2856 [1] [a]). Further, a

---

5. Respondents assert that petitioners received the majority of their revenue, between 63% and 96%, from the New York City School District, with the average being approximately 82%.

school district that has a charter school operating within its geographical area must "pay directly to the charter school any federal or state aid attributable to a student with a disability attending charter school in proportion to the level of services for such student with a disability that the charter school provides directly or indirectly" (Education Law § 2856 [1] [b]).

Should a school district fail to make the mandatory payments outlined in Education Law § 2856, the Comptroller must deduct from any state funds that become due to such school district an amount equal to the unpaid obligation to the charter school (*see* Education Law § 2856 [2]).[6] Upon closure or dissolution of a charter school, its students and student records must be transferred to the school district wherein the charter school is located (*see* Education Law § 2851 [2] [t]), while its assets must be remitted back to the school district or to another charter school operating within the same school district (*id.*).

The Act, however, makes clear that a charter school does "not have the power to levy taxes or to acquire property by eminent domain" (Education Law § 2853 [1] [e]). The Act also makes it clear that no civil liability may attach to a charter entity, the Board of Regents, or to any of their members or employees, individually or collectively, for any acts or omissions of the charter school (*see* Education Law § 2853 [1] [g]). Also, it exempts the local school district, the charter entity and the State from liability for any debts or financial obligations of a charter school or any person and/or corporate entity that operates a charter school (*id.*).

### The 2005 Legislation and This Lawsuit

In 2005, the Legislature adopted the school audit bill which directs the State Comptroller to audit all school districts, boards of cooperative educational services (BOCES) and charter schools operating within this state by March 31, 2010 (*see* L 2005, ch 267; *see also* Education Law § 2854 [1] [c]; General Municipal Law § 33 [2]). The Legislature determined that additional audits should be conducted by the State Comptroller because

> "[s]chool districts, BOCES and charter schools are all public entities that use taxpayer funds. As such, the taxpayers who support these enterprises have a

---

**6.** The Act also encourages "[p]rivate persons and organizations . . . to provide funding and other assistance to the establishment or operation of charter schools" (Education Law § 2853 [4] [d]).

right to know that they are managed effectively and that proper measures are in place to protect against fraud and waste. The recent school district financial scandals and the failure of the independent auditor in those districts have made it clear that these additional safeguards are not merely appropriate; they are a good investment that will protect State and local taxpayers from financial practices that do not meet State standards" (Budget Report on Bills, Bill Jacket, L 2005, ch 267, at 5).

As amended, Education Law § 2854 (1) (c) requires that charter schools be subject to the State Comptroller's audit just like other public schools. The Legislature also amended General Municipal Law § 33 to require that the Comptroller "cause the accounts of every school district, BOCES and charter school in the state to be examined" no later than March 31, 2010 (General Municipal Law § 33 [2]).

As a result of the 2005 amendments, respondents, by letter dated July 1, 2007, notified 31 charter schools located in New York City that the Office of the State Comptroller had scheduled a performance audit of charter schools authorized by the New York City Department of Education. The State Comptroller cited General Municipal Law § 33 as his authority to conduct the performance audits of the charter schools pursuant to article V, § 1 of the New York State Constitution. The audits were to include an assessment as to the extent that New York City charter schools met quantitative academic achievement goals and complied with student selection procedures and criteria, as set forth in their charters.

Upon receiving notice of the State Comptroller's intent to audit them, several charter schools, by letter dated August 3, 2007, questioned whether the Comptroller had the authority to conduct academic performance audits. The Comptroller responded by letter dated September 27, 2007, reiterating that his authority derived from the 2005 amendments to General Municipal Law § 33, and that this Court's decision in *Matter of McCall v Barrios-Paoli* (93 NY2d 99 [1999]) had clarified that the State Comptroller's audit authority includes the power to conduct both financial and performance audits. The Comptroller concluded that the audits were proper because the matters to be examined "have clear fiscal implications for the public as well as the governmental entities that

fund the charter schools and have programmatic and oversight responsibilities with respect to them" (Letter from Office of State Comptroller, Sept. 27, 2007, record at 254).

In December 2007, petitioners[7] commenced this combined CPLR article 78 proceeding and an action for declaratory and injunctive relief against respondents Thomas P. DiNapoli, as Comptroller of the State of New York, the Office of the State Comptroller and the State of New York. In particular, petitioners seek a declaratory judgment that the Comptroller lacks the authority to conduct audits of charter schools because article V, § 1 of the New York State Constitution prohibits the Legislature from assigning to the Comptroller the power or duty of auditing charter schools since they are not political subdivisions of the State, nor is the task of auditing charter schools an administrative duty incidental to the Comptroller's constitutionally prescribed functions. Further, petitioners seek a judgment declaring that the grant of the Comptroller's audit authority over charter schools contained in General Municipal Law § 33 (2) and Education Law § 2854 (1) (c) is unconstitutional and seek a permanent injunction prohibiting the Comptroller from conducting audits of charter schools. Respondents answered and moved for summary judgment.

Supreme Court denied respondents' motion for summary judgment, holding that insofar as General Municipal Law § 33 (2) and Education Law § 2854 (1) (c) authorize or direct the Comptroller to audit charter schools, they violate article V, § 1 of the New York State Constitution (20 Misc 3d 235 [2008]).

---

7. The caption indicates that there are 15 charter school petitioners: The Opportunity Charter School, New Heights Academy Charter School, The Renaissance Charter School, International Leadership Charter School, Hellenic Classical Charter School, Harlem Children's Zone Promise Academy Charter School, Harlem Children's Zone Promise Academy II Charter School, John V. Lindsay Wildcat Academy Charter School, Hyde Leadership Academy Charter School, New York Center for Autism Charter School, Brooklyn Charter School, Manhattan Charter School, South Bronx Charter School for International Cultures and the Arts, Community Roots Charter School and Ross Global Academy Charter School. However, respondents assert that there are 16 charter school petitioners because the list did not include the Future Leaders Institute Charter School. Petitioners also include two not-for-profit organizations, The New York Charter Schools Association, Inc., and The New York City Center for Charter School Excellence, Inc. The charter school petitioners are members of The Charter Schools Association, Inc.

The court permanently enjoined the Comptroller from conducting any further charter audits.[8]

A divided Appellate Division reversed, holding that the Legislature did not violate NY Constitution, article V, § 1 when it directed audits of charter schools by the Comptroller (60 AD3d 119 [2009]). The majority found that given the Legislature's broad delegatory authority regarding the Comptroller's authority and the significant public funding involved, the Comptroller's fundamental duty to supervise state fiscal matters was implicated. Therefore, the task of auditing charter schools was an administrative duty incidental to the Comptroller's constitutionally prescribed functions. Petitioners appeal as of right, pursuant to CPLR 5601 (b) (1), and we now reverse.

## Analysis

It is well settled that "[l]egislative enactments enjoy a strong presumption of constitutionality" (*LaValle v Hayden*, 98 NY2d 155, 161 [2002]). A party contesting the constitutionality of a statute must overcome a very heavy initial burden by proving that the invalidity of the law is beyond a reasonable doubt (*see People v Tichenor*, 89 NY2d 769, 773 [1997], citing *People v Pagnotta*, 25 NY2d 333, 337 [1969]). Here, petitioners assert that the Legislature violated article V, § 1 of the New York State Constitution which provides in pertinent part that

"[t]he comptroller shall be required: (1) to audit all vouchers before payment and all official accounts; (2) to audit the accrual and collection of all revenues and receipts; and (3) to prescribe such methods of accounting as are necessary for the performance of the foregoing duties. The payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void . . . In such respect the legislature shall define the powers and duties and may also assign to him or her: . . . supervision of the accounts of any political subdivision of the state . . . The legislature shall assign to him or her no administrative duties, excepting such as may be incidental to the performance of these

---

8. As an initial matter, Supreme Court also rejected respondents' argument that charter schools lack the legal capacity to assert a constitutional challenge against the State, finding that petitioners have standing.

functions, any other provision of this constitution to
the contrary notwithstanding."

Petitioners contend that assignment to the Comptroller of the
power and duty to audit charter schools violates the constitu-
tional provision because charter schools are not political subdivi-
sions of the State, nor is the task of auditing charter schools an
administrative duty that is incidental to the Comptroller's
constitutionally prescribed functions. We agree.

Although vigorously contested below, respondents do not now
press the argument that a charter school is a "political subdivi-
sion" of the State. They maintain, however, that the Legisla-
ture's assignment to the Comptroller of the duty to audit
charter schools is permitted by the broad authority conferred by
article V, § 1. They further contend that the Legislature's as-
signment of auditing duties to the Comptroller is constitutional
because charter schools have a significant fiscal impact on both
the State and school districts and should fall under the
Comptroller's incidental power to audit school districts.

In 1925, the Legislature determined that a major restructur-
ing of government departments and their responsibilities was
necessary. Article V, § 1 was adopted in order to establish
parameters of the Comptroller's duties. We noted this legislative
history in *Blue Cross & Blue Shield of Cent. N.Y. v McCall* (89
NY2d 160 [1996]) as support for our determination that the
Legislature did not have the constitutional authority to assign
to the Comptroller the power to conduct audits of private health
insurance companies.

There, we rejected the State Comptroller's arguments, which
had been based upon practical concerns and public policy. Here,
as in *Blue Cross*, the policy concerns appear to be substantial.
However, the legislative enactments of General Municipal Law
§ 33 (2) and Education Law § 2854 (1) (c), to the extent they
grant the Comptroller the power to audit charter schools, violate
article V, § 1. Indeed, in *Blue Cross*, we observed that it was
important that the Insurance Department had long since been
established and empowered to conduct audits and examinations
of the insurance business (*see* 89 NY2d at 168-169).

Here, the Legislature has designated the Board of Regents
and the charter entities as the public agents authorized to
supervise and oversee charter schools. Respondents' proposed
audits include an assessment as to the extent to which New
York City charter schools meet quantitative academic

achievement goals and comply with student selection procedures and criteria, as set forth in their charters. Audits of charter schools—not political subdivisions—cannot be construed as incidental to the audits of school districts. The "plainly expressed constitutional prohibition" of article V, § 1 simply does not support respondents' expansive reading of the term "incidental" (*Blue Cross*, 89 NY2d at 170).

Indeed, "[a]rticle V, § 1 of the State Constitution is a wellspring of the Comptroller's authority . . . [which] broadly empowers the Legislature to delegate to the Comptroller both supervision of the accounts of any political subdivision of the State and administrative duties incidental thereto" (*Matter of McCall v Barrios-Paoli*, 93 NY2d 99, 105 [1999]). However, we have noted that "the objective behind article V, § 1 was to protect the 'independent character of the Comptroller's audit function,' a goal that was accomplished by prohibiting the Legislature from assigning to the Comptroller unrelated duties" (*Matter of Worth Constr. Co., Inc. v Hevesi*, 8 NY3d 548, 552 [2007], quoting *Matter of McCall v Barrios-Paoli*, 93 NY2d at 107) and is fulfilled by our holding today.

Respondents maintain that our decision in *Barrios-Paoli* supports their contention that school districts, as recipients of billions of dollars in annual state aid, some passed along to support charter schools, are subject to the Comptroller's audit because the State's interest in monies appropriated to these school districts does not cease upon the districts' receipt of the funds. Respondents further contend that the authority to supervise the accounts of the State's political subdivision—the school district—leaves ample room for a wider inquiry into the efficiency and effectiveness of the district's expenditures of state funds for charter schools. In other words, respondents believe that the Comptroller has the authority to "follow the money."

Respondents' reliance on *Barrios-Paoli*, however, is misplaced. The question presented in *Barrios-Paoli* was whether the Comptroller had the authority to inquire into the management and operations of city agencies that are political subdivisions. In answering that question in the affirmative, we did not indicate that the State Comptroller, as the State's chief fiscal officer, could therefore audit the management and operations of an entity—not a political subdivision—solely on the basis that it receives state funds and performs a governmental function.

Neither does the language of article V, § 1—"[t]he payment of any money of the state, or of any money under its control, or the refund of any money paid to the state, except upon audit by the comptroller, shall be void"—support the constitutionality of the Legislature's delegation to the Comptroller of the duty to audit charter schools. Respondents argue that the Comptroller's authority to audit all vouchers before payment and all accounts ("pre-audit") includes, by implication, "post-audit" authority to confirm that funds have been correctly disbursed and have been used in conformity with the particular purpose or program. However, respondents' argument that the Comptroller is constitutionally entitled to audit the performance of charter schools, and perhaps question the wisdom of how charter schools provide instruction, cannot be considered to be within an audit of the monies paid by a school district acting as a mere conduit by forwarding the funds necessary to pay a student's tuition. The money paid by a school district to a charter school is no longer under the State's control once the funds have been transferred.

This does not leave charter schools without fiscal oversight as the fiscal affairs of each charter school are indeed subject to oversight by the Board of Regents, its charter entity, the school's board of trustees and the mandatory independent annual audit. Accountability to the public is thus secured. The ultimate check, of course, is that a school may lose its charter if it is not meeting educational standards, as charters are renewed every five years.

### Conclusion

Petitioners have shown, beyond a reasonable doubt, that the Legislature's delegation of auditing authority over charter schools to the Comptroller violates article V, § 1 of the New York State Constitution. The provisions of General Municipal Law § 33 (2) and Education Law § 2854 (1) (c), to the extent that these provisions direct the Comptroller to conduct audits of charter schools, are thus declared unconstitutional and the declaratory and injunctive relief, as granted by Supreme Court, is proper.

Accordingly, the order of the Appellate Division should be reversed, with costs, and the order and judgment of Supreme Court should be reinstated.

Chief Judge LIPPMAN (concurring). While I agree with the

majority that the challenged legislation directing fiscal and programmatic audits of all of the State's charter schools by the end of March 2010 exceeds the authority conferred upon the Legislature to shape the mission of the State Comptroller pursuant to article V, § 1 of New York's Constitution, I write separately to underscore that the issue before us has less to do with the power of the Comptroller than it does with the power of the Legislature. All we hold is that the Legislature could not, consistent with the express limitation upon its authority to define the Comptroller's agenda contained in article V, § 1, direct the Comptroller to perform both fiscal and programmatic audits of entities that are neither political subdivisions of the State nor so intertwined with political subdivisions that their audit would be reasonably incidental to a political subdivision audit. We do not hold that charter schools may never be audited by the State Comptroller. Judge Graffeo has raised the possibility that a less plenary audit confined to economic matters might be permissibly directed under article V, § 1. It might also be borne in mind that while article V, § 1 is an important wellspring of the Comptroller's power, it is not its only source. Under article X, § 5 of the Constitution, the Comptroller is expressly permitted to supervise the accounts of a public corporation and it appears that charter schools, which are indisputably corporate constituents of the public education system and share many of the salient characteristics of the public benefit corporations traditionally audited by the Comptroller under the authority of article X, § 5 (*see* 20 Misc 3d 235, 259-266 [2008] [same case]), may well be deemed public corporations within the meaning of that provision. If so, they would clearly be auditable by the Comptroller—but at his or her discretion, not the direction of the Legislature (*see Patterson v Carey*, 41 NY2d 714, 723-724 [1977]). These alternative theories pursuant to which the accounts of charter schools might be brought under the Comptroller's supervision are not now before us. They are properly raised only to show that we have not, by enforcing the constitutional limitation upon the Legislature's prerogative to make use of the Comptroller's office, thereby placed charter schools beyond the Comptroller's power.

GRAFFEO, J. (concurring). I agree with the majority that the 2005 legislation directing the Comptroller to audit charter schools to the same extent as public school districts violates article V, § 1 of the New York Constitution. I do not believe academic performance audits fall within the administrative duties that are incidental to the Comptroller's supervision of political

subdivisions, which include school districts. But I do not subscribe to the majority opinion to the extent it suggests that article V, § 1 prohibits the Legislature from assigning any audit function to the Comptroller. I write separately to express my belief that article V, § 1 grants the Legislature some flexibility in authorizing the Comptroller to conduct more limited, purely financial audits of the public funding provided to charter schools.

Under article V, § 1 of the New York Constitution, the Legislature may assign to the Comptroller the "supervision of the accounts of any political subdivision of the state" as well as "administrative duties" that are "incidental to the performance" of the Comptroller's functions. This constitutional provision "designates the Comptroller as the independent auditing official for the affairs of the State" (*Matter of Dinallo v DiNapoli*, 9 NY3d 94, 101 [2007] [internal quotation marks and citation omitted]), whose fundamental duty is "to [s]uperintend the fiscal concerns of the state" (*Blue Cross & Blue Shield of Cent. N.Y. v McCall*, 89 NY2d 160, 166 [1996] [internal quotation marks and citation omitted]). We have described article V, § 1 as the "wellspring of the Comptroller's authority" and recognized the authority of "the Legislature to delegate to the Comptroller both supervision of the accounts of any political subdivision of the State and administrative duties incidental thereto" (*Matter of McCall v Barrios-Paoli*, 93 NY2d 99, 105 [1999]).

Although the Legislature has broad power to assign tasks to the Comptroller, this authority is not without limitation inasmuch as article V, § 1 prohibits the Legislature from "assigning to the Comptroller administrative tasks that are not incidental to his duty to superintend the fiscal concerns of the State" (*Dinallo*, 9 NY3d at 103). In *Dinallo*, for example, we held that the Legislature could not direct the Comptroller to audit the New York State Insurance Department Liquidation Bureau because the rehabilitation or liquidation of distressed insurers—the sole purpose of the Liquidation Bureau, an arm of the Superintendent of Insurance in his separate capacity as court-appointed receiver on behalf of private businesses—"has no impact on the state fisc" (*id.* at 102). Similarly, in *Blue Cross*, we concluded that the Legislature could not require the Comptroller to audit private not-for-profit health insurance companies that were subject to state regulation.

The controversy before us focuses on legislative action in 2005, when the Legislature directed the Comptroller to audit

each school district, board of cooperative educational services (BOCES) and charter school at least once by 2010 (L 2005, ch 267; *see also* General Municipal Law § 33 [2]; Education Law § 2854 [1] [c]).[1] The legislation was prompted by the misappropriation of millions of dollars in several school districts in which the independent auditor—described as the "linchpin of the existing system"—failed to disclose "blatant and ongoing fraud" (*see* Budget Rep on Bills, Bill Jacket, L 2005, ch 267).[2] The legislation granted the Comptroller the authority to audit charter schools in the same manner as school districts (*see* General Municipal Law § 33 [2] [b]).

There is no doubt that the Legislature's delegation of comprehensive auditing functions to the Comptroller regarding school districts was constitutional. The Comptroller is empowered to conduct both fiscal and performance audits of "political subdivisions" of the State under article V, § 1 (*see Barrios-Paoli*, 93 NY2d at 108), which include school districts.

The question here is whether the Legislature could require that the Comptroller undertake the very same uncircumscribed audits of charter schools—which the Comptroller does not assert to be political subdivisions in their own right—as "incidental" to the audits of school districts. The majority opinion, correctly in my view, finds that it could not. As the trial court below observed, characterizing "the Legislature's grant of full fiscal and programmatic audit authority over the 200 charter schools authorized by the [Charter Schools Act]—including evaluation of student educational performance—as 'incidental' puts far more weight on the term than it reasonably can bear" (20 Misc 3d 235, 268 [Sup Ct, Albany County 2008]). Clearly, one of the purposes in creating charter schools was to foster more innovative and experimental education environments. It is therefore a statutory responsibility of the Board of Regents and charter entities to evaluate the instructional objectives and academic achievements of charter schools (*see* Education Law

---

1. The legislation also permits the Comptroller to conduct further audits of these entities "based upon a risk assessment process conducted by the comptroller which may include investigations of alleged improprieties, previous audit findings and recommendations, or other financial performance indicators" (General Municipal Law § 33 [2] [a]).

2. According to respondents, although the Comptroller previously possessed the authority to audit school districts and BOCES (*see* General Municipal Law § 33 [1]), he discontinued the practice of regularly auditing them in the 1970s due to budget cutbacks and in reliance on the annual independent audits—which are now still required in addition to the Comptroller's audits.

§ 2853 [2]; § 2857 [2]). Nevertheless, based on the unique status of charter schools and the manner in which they receive substantial public financing, I believe that the Legislature could, within the parameters of the Constitution, direct the Comptroller to conduct limited fiscal audits if it chose to do so.

As recognized by the Appellate Division majority, the operation of charter schools implicates both the significant governmental function of providing a public education and large amounts of taxpayer funds. First, by constitutional mandate, the Legislature is required to provide children with a free education (see NY Const, art XI, § 1). Although the Legislature historically discharged this responsibility through the creation and maintenance of public schools, it now fulfills this duty in part through the funding of charter schools. Indeed, "[t]he powers granted to a charter school . . . constitute the performance of essential public purposes and governmental purposes of this state" (Education Law § 2853 [1] [d]). And while charter schools operate apart from school districts, the Charter Schools Act does not create a purely private status for charter schools; rather, the Act makes clear that they are part of the "public school system" (Education Law § 2850 [2] [e]). This distinguishes their status from private entities, as we addressed in *Blue Cross*.

Second, charter schools are financially linked to school districts in that public funds flow to charter schools through school districts. Specifically, the school district of residence for each charter school student must pay that student's "basic tuition" amount directly to the charter school (see Education Law § 2856 [1] [a]).[3] Because payments to charter schools are based on enrollment figures, any improper documentation of such figures would negatively affect school districts by reducing available revenues. In more general terms, any money a school district pays over to a charter school diminishes the revenue available to the school district to fund its own operations. A vital financial nexus therefore exists between charter schools and school districts.

Given the special character of charter schools and their relationship to the public school system, in conjunction with the

---

**3.** The school district is further obliged to "pay directly to the charter school any federal or state aid attributable to a student with a disability attending charter school in proportion to the level of services for such student with a disability that the charter school provides directly or indirectly" (Education Law § 2856 [1] [b]).

broad authority envisioned by article V, § 1, I conclude that the Legislature could constitutionally direct the Comptroller to perform fiscal audits of the public funding that charter schools receive as "incidental" to his comprehensive oversight of school districts themselves. Although financial controls are already in place for both school districts and charter schools, the legislative history underlying the 2005 amendments indicates that preexisting independent audits of school districts were problematic, necessitating additional oversight by the Comptroller. Charter schools cannot be considered immune from financial mismanagement problems nor are they unable to benefit from fiscal audit recommendations.[4] I therefore would not foreclose the Legislature from granting the Comptroller appropriately limited auditing authority with respect to charter schools.

Judges READ, SMITH and JONES concur with Judge CIPARICK; Chief Judge LIPPMAN concurs in result in a separate opinion; Judge GRAFFEO concurs in result in another opinion in which Judge PIGOTT concurs.

Order reversed, etc.

---

4. In their brief, respondents state that charter school audits (of non-petitioner schools) conducted before the commencement of this litigation revealed fiscal problems "that had not been previously discovered or disclosed by the independent audits, including spending for a lavish retreat and substantial unauthorized payments to staff and others." They further assert that "in an audit of the New York City Department of Education that preceded the audits involved here, the Comptroller found that the Department was not fully monitoring the 23 charter schools that it oversees."